# In the United States Court of Appeals for the Eleventh Circuit

No. 23-10616

_____

LEROY PERNELL, ET AL.,

*Plaintiffs-Appellees*,

v.

ROBERT ANDRADE, ET AL.,

*Movants-Appellants*.

_____

## INITIAL BRIEF OF MOVANTS-APPELLANTS

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
CASE NO. 4:22-CV-304-MW-MAF

_____

DAVID AXELMAN
  *General Counsel*
J. MICHAEL MAIDA
  *Deputy General Counsel*
THE FLORIDA HOUSE OF REPRESENTATIVES
329 The Capitol
Tallahassee, FL 32399
(850) 717-5500
*david.axelman@myfloridahouse.gov*

ASHLEY MOODY
  *Attorney General*
HENRY C. WHITAKER
  *Solicitor General*
DANIEL W. BELL
  *Chief Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF FLORIDA
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
*daniel.bell@myfloridalegal.com*

*LeRoy Pernell et al., v. Robert Andrade, et al., No. 23-10616*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Movants-Appellants certify that the following is a complete list of interested

persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit

Rule 26.1:

1.   Almond, Russell, *Plaintiff-Appellee*

2.   Altizer, Tiffany, *Defendant*

3.   Alvarez, Cesar L., *Defendant*

4.   Alvarez, Maximo, *Defendant*

5.   American Civil Liberties Union of Florida, *Counsel for Plaintiffs-Appellees*

6.   American Civil Liberties Union, *Counsel for Plaintiffs-Appellees*

7.   Andrade, Robert, *Movant-Appellant*

8.   Armas, Jose J., *Defendant*

9.   Austin, Sharon Wright, *Plaintiff-Appellee*

10.  Axelman, David, *Counsel for Movants-Appellants*

11.  Azis, Jacqueline Nicole, *Counsel for Plaintiffs-Appellees*

12.  Ballard, Kathryn, *Defendant*

13.  Ballard Spahr LLP, *Counsel for Plaintiffs-Appellees*

14.  Bell, Daniel, *Counsel for Movants-Appellants*

15.  Bell, Melony*, Movant-Appellant*

16.  Bell, Zachary Chandler, *Defendant*

*LeRoy Pernell et al., v. Robert Andrade, et al., No. 23-10616*

17.  Blakenship, Katherine, *Counsel for Plaintiffs-Appellees*

18.  Boaz, Timothy, *Defendant*

19.  Borrero, David, *Movant-Appellant*

20.  Brandon, David L., *Defendant*

21.  Butchey, Deanne, *Defendant*

22.  Callahan, Sandra, *Defendant*

23.  Carrere, Michael, *Defendant*

24.  Cavazos, Ann Marie, *Defendant*

25.  Cerio, Timothy, *Defendant*

26.  Chicken, Eric, *Defendant*

27.  Christy, Bill, *Defendant*

28.  Cliatt, II, Otis, *Defendant*

29.  Cole, Richard P., *Defendant*

30.  Coleman, Santino, *Counsel for Plaintiffs-Appellees*

31.  Collins, Peter, *Defendant*

32.  Colson, Dean S., *Defendant*

33.  Condello, Jeff, *Defendant*

34.  Conte, Joseph, *Defendant*

35.  Cooper & Kirk, PLLC, *Counsel for Defendants*

36.  Cooper, Charles J., *Counsel for Defendants*

*LeRoy Pernell et al., v. Robert Andrade, et al., No. 23-10616*

37.     Corcoran, Richard, *Defendant*

38.     Corr, Christopher T., *Defendant*

39.     Dauphin, Johana, *Plaintiff-Appellee*

40.     De Las Cuevas-Diaz, Vivian, *Defendant*

41.     Diaz, Jr., Manny, *Defendant*

42.     Donnelly, N. Rogan, *Defendant*

43.     Dorsey, Dana, Thompson, *Plaintiff-Appellee*

44.     Dortch, Jr., Thomas W., *Defendant*

45.     Duart, Carlos A., *Defendant*

46.     Dubose, Michael, *Defendant*

47.     Dunn, Marvin, *Plaintiff-Appellee*

48.     Edge, Aubrey, *Defendant*

49.     Edinger, Gary, *Counsel for Plaintiffs-Appellees* in *Novoa v. Diaz*, No. 22-13994

50.     Edwards, Jerry Crawford, *Counsel for Plaintiffs-Appellees*

51.     Ezray, Evan, *Counsel for Movants-Appellants*

52.     Fajana, Morenike, *Counsel for Plaintiffs-Appellees*

53.     Fernandez-Barquin, Juan, *Movant-Appellant*

54.     Fine, Randy, *Movant-Appellant*

55.     First Amendment Forum at University of South Florida, *Plaintiff-Appellee* in *Novoa v. Diaz*, No. 22-13994

*LeRoy Pernell et al., v. Robert Andrade, et al., No. 23-10616*

56.      Fitzpatrick, Magistrate Judge Martin A., U.S. District Court for the Northern District of Florida

57.      Florida A&M University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

58.      Florida Board of Governors of the State University System, *Defendant (Dismissed on Nov. 22, 2022)*

59.      Florida International University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

60.      Florida Office of the Attorney General, *Counsel for Movants-Appellants*

61.      Florida State Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

62.      Foundation for Individual Rights and Expression, *Counsel for Plaintiffs-Appellees* in *Novoa v. Diaz*, No. 22-13994

63.      Frost, Patricia, *Defendant*

64.      Gabadage, Nimna, *Defendant*

65.      Gaekwad, Danny, *Defendant*

66.      Gary S. Edinger & Associates PA – Gainesville FL, *Counsel for Plaintiffs-Appellees* in *Novoa v. Diaz*, No. 22-13994

67.      Gonzalez, Jorge, *Defendant*

68.      Greubel, Greg, *Counsel for Plaintiffs-Appellees* in *Novoa v. Diaz*, No. 22-13994

69.      Griffin, Michael, *Defendant*

70.      Haddock, Edward, *Defendant*

71.      Harper, Kristin, *Defendant*

72.      Heavener, James W., *Defendant*

*LeRoy Pernell et al., v. Robert Andrade, et al., No. 23-10616*

73.    Henderson, Jim W., *Defendant*

74.    Hinger, Sarah Ann, *Counsel for Plaintiffs-Appellees*

75.    Hosseini, Morteza, *Defendant*

76.    Horton, Oscar, *Defendant*

77.    Johnson, Alexsis Marie, *Counsel for Plaintiffs-Appellees*

78.    Jones, Ken, *Defendant*

79.    Jordan, Darlene Luccio, *Defendant*

80.    King, Stephen, *Defendant*

81.    Kuntz, Thomas G., *Defendant*

82.    Lamb, Brian, *Defendant*

83.    Lawson, Kevin, *Defendant*

84.    Leckerman, Jason Allen, *Counsel for Plaintiffs-Appellees*

85.    Lee, Jin Hee, *Counsel for Plaintiffs-Appellees*

86.    Leftheris, Julie, *Defendant*

87.    Lemasters, Lauren D., *Defendant*

88.    Levine, Alan, *Defendant*

89.    Lopez, Daniella, *Defendant*

90.    Lowell, Natasha, *Defendant*

91.    Lubin, Catharine, *Counsel for Plaintiffs-Appellees*

92.    Lugo, Cristhofer, *Defendant*

*LeRoy Pernell et al., v. Robert Andrade, et al., No. 23-10616*

93. Lydecker, Charles, *Defendant*

94. Mabatah, Isiuwa Jacqueline, *Counsel for Plaintiffs-Appellees*

95. Maggard, Randall Scott, *Movant-Appellant*

96. Maida, Michael, *Counsel for Movants-Appellants*

97. Martins, Alex, *Defendant*

98. Massullo, Ralph, *Movant-Appellant*

99. Mateer, Craig, *Defendant*

100. McAlpin, Caryl, *Defendant*

101. McClain, Stan, *Movant-Appellant*

102. McLaurin, Charles, *Counsel for Plaintiffs-Appellees*

103. McNamara, Caroline A., *Counsel for Plaintiffs-Appellees*

104. Michael, Deanna, *Defendant*

105. Miklos, John, *Defendant*

106. Mills, Harold, *Defendant*

107. Monbarren, Lauran, *Defendant*

108. Moore, Kimberly, *Defendant*

109. Moraff, Laura Beth, *Counsel for Plaintiffs-Appellees*

110. Morris, Joshua, *Counsel for Plaintiffs-Appellees* in in *Novoa v. Diaz*, No. 22-13994

111. NAACP Legal Defense & Educational Fund, *Counsel for Plaintiffs-Appellees*

*LeRoy Pernell et al., v. Robert Andrade, et al., No. 23-10616*

112.  Nascimento, Isabella Salomao, *Counsel for Plaintiffs-Appellees*

113.  Novoa, Adriana, *Plaintiff-Appellee* in in *Novoa v. Diaz*, No. 22-13994

114.  Oberdorf, Tobin Rogers, *Movant-Appellant*

115.  Occhipinti, Anna, *Counsel for Plaintiffs-Appellees*

116.  Ohlendorf, John David, *Counsel for Defendants*

117.  Okaty, Michael, *Defendant*

118.  O'Keefe, Daniel T., *Defendant*

119.  Palyam, Nithin, *Defendant*

120.  Park, Shelley, *Plaintiff-Appellee*

121.  Patel, Rahul, *Defendant*

122.  Patel, Shilen, *Defendant*

123.  Payne, Bobby, *Movant-Appellant*

124.  Pernell, LeRoy, *Plaintiff-Appellee*

125.  Perry, Belvin, Jr., *Defendant*

126.  Phalin, Amanda J., *Defendant*

127.  Piccolo, Fredrick, *Defendant*

128.  Powers, Marsha D., *Defendant*

129.  Prescott, T. Gene, *Defendant*

130.  Ramer, John, *Counsel for Defendants*

131.  Rechek, Samuel, *Plaintiff-Appellee* in in *Novoa v. Diaz*, No. 22-13994

*LeRoy Pernell et al., v. Robert Andrade, et al., No. 23-10616*

132. Reed, Craig, *Defendant*

133. Ridley, Fred S., *Defendant*

134. Roth, Justin, *Defendant*

135. Roth, Rick, *Movant-Appellant*

136. Rowe, Chanel T., *Defendant*

137. Sandoval, Jennifer, *Plaintiff-Appellee*

138. Sargeant, Deborah, *Defendant*

139. Sarnoff, Marc D., *Defendant*

140. Sasser, Bob, *Defendant*

141. Schneider, Jenifer, *Defendant*

142. Scott, Steven, *Defendant*

143. Seay, Beverly J., *Defendant*

144. Seixas, Melissa, *Defendant*

145. Self, William, *Defendant (Dismissed on Nov. 17, 2022)*

146. Shoaf, Jason, *Movant-Appellant*

147. Silagy, Eric, *Defendant*

148. Sirois, Tyler, *Movant-Appellant*

149. Steinbaugh, Adam, *Counsel for Plaintiffs-Appellees* in in *Novoa v. Diaz*, No. 22-13994

150. Stermon, Kent, *Defendant*

*LeRoy Pernell et al., v. Robert Andrade, et al., No. 23-10616*

151. Stone, Kenward, *Defendant*

152. Sykes, Emerson James, *Counsel for Plaintiffs-Appellees*

153. Thiel, John, *Defendant*

154. Tilley, Daniel Boaz, *Counsel for Plaintiffs-Appellees*

155. Tobin, Charles David, *Counsel for Plaintiffs-Appellees*

156. Tovar, Rogelio, *Defendant*

157. Truenow, Keith, *Movant-Appellant*

158. Trujillo, Carlos, *Defendant*

159. University of Central Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

160. University of Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

161. University of South Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

162. Walker, Judge Mark E., U.S. District Court for the Northern District of Florida

163. Washington, Nicole, *Defendant*

164. Watson, Leah Monique, *Counsel for Plaintiffs-Appellees*

165. Weatherford, Drew, *Defendant*

166. Weatherford, William, *Defendant*

167. Whitaker, Henry, *Counsel for Movants-Appellants*

168. Wold, Megan M., *Counsel for Defendants*

169.   Zucker, Anita G., *Defendant*

Dated: April 17, 2023

*/s/ Daniel W. Bell*
Daniel W. Bell

## ORAL ARGUMENT STATEMENT

The parties have submitted a joint motion asking the Court to expedite this appeal for oral argument. As of this filing, that motion is pending before the Court.

# TABLE OF CONTENTS

ORAL ARGUMENT STATEMENT ............................................................... i

TABLE OF CONTENTS .......................................................................... ii

TABLE OF AUTHORITIES ..................................................................... iii

STATEMENT OF JURISDICTION ............................................................ 1

STATEMENT OF THE ISSUES ................................................................ 2

INTRODUCTION.................................................................................. 3

STATEMENT OF THE CASE ................................................................... 4

STANDARD OF REVIEW....................................................................... 7

SUMMARY OF ARGUMENT .................................................................. 7

ARGUMENT ...................................................................................... 8

   I.   The Documents at Issue Fall Squarely Within The Scope of the Legislative Privilege. ......................................................................................... 8

  II.  The Legislative Privilege Is Absolute in Section 1983 Cases............................. 11

CONCLUSION ................................................................................... 31

CERTIFICATE OF COMPLIANCE .......................................................... 33

CERTIFICATE OF SERVICE ................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Almonte v. City of Long Beach,*
  478 F.3d 100 (2d Cir. 2007) .......................................................................... 10

*Am. Trucking Ass'ns, Inc. v. Alviti,*
  14 F.4th 76 (1st Cir. 2021) ............................................................................ 14

*Bogan v. Scott-Harris,*
  523 U.S. 44 (1998) .................................................................. 18, 19, 22, 26

*Brown & Williamson Tobacco Corp. v. Williams,*
  62 F.3d 408 (D.C. Cir. 1995) ............................................................... Passim

*Bruce v. Riddle,*
  631 F.2d 272 (4th Cir. 1980) ....................................................................... 10

*Burge v. Par. of St. Tammany,*
  187 F.3d 452 (5th Cir. 1999) ....................................................................... 29

*Burtnick v. McLean,*
  76 F.3d 611 (4th Cir. 1996) ......................................................................... 13

*Dennis v. Sparks,*
  449 U.S. 24 (1980) ................................................................. 19, 20, 21, 30

*Eastland v. U.S. Servicemen's Fund,*
  421 U.S. 491 (1975) ..................................................................................... 15

*EEOC v. Wash. Suburban Sanitary Comm'n,*
  631 F.3d 174 (4th Cir. 2011) ............................................................... Passim

*Ex parte Young,*
  209 U.S. 123 (1908) ..................................................................................... 28

*Gravel v. United States,*
  408 U.S. 606 (1972) ..................................................................................... 17

*In re Hubbard,*
  803 F.3d 1298 (11th Cir. 2015) ........................................................... Passim

*In re Sealed Case,*
  121 F.3d 729 (D.C. Cir. 1997) ..................................................................... 27

*Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't,*
  849 F.3d 615 (5th Cir. 2017) ....................................................................... 14

*Kilbourn v. Thompson,*
  103 U.S. 168 (1880) ............................................................................... 20, 21

*Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency,*
  440 U.S. 391 (1979) ..................................................................................... 26

*League of Women Voters of Fla., Inc. v. Lee,*
  340 F.R.D. 446 (N.D. Fla. 2021) ................................................................. 10

*Lee v. City of L.A.*,
  908 F.3d 1175 (9th Cir. 2018) ................................................................ 14
*MINPECO, S.A. v. Conticommodity Servs., Inc.*,
  844 F.2d 856 (D.C. Cir. 1988) ............................................................... 15
*Mitchell v. Forsyth*,
  472 U.S. 511 (1985) ........................................................................ 28, 29
*Nelson v. Knox*,
  256 F.2d 312 (6th Cir. 1958) ................................................................ 26
*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) ............................................................................... 28
*Pulliam v. Allen*,
  466 U.S. 522 (1984) ............................................................................... 29
*Scott v. Taylor*,
  405 F.3d 1251 (11th Cir. 2005) ........................................................ 29, 30
*Supreme Court of Va. v. Consumers Union of U.S., Inc.*,
  446 U.S. 719 (1980) .......................................................................... 20, 21
*Tenney v. Brandhove*,
  341 U.S. 367 (1951) ...................................................................... Passim
*Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*,
  229 F.3d 478 (5th Cir. 2000) ................................................................ 30
*United States v. Gillock*,
  445 U.S. 360 (1980) ...................................................................... Passim
*United States v. Nixon*,
  418 U.S. 683 (1974) ............................................................................... 26
*VanHorn v. Oelschlager*,
  502 F.3d 775 (8th Cir. 2007) ................................................................ 30
*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ...................................................................... Passim

**Statutes**

Fla. Const. Art. III, § 3 ............................................................................. 18
U.S. Const. art. I, § 6, cl. 1 ..................................................................... 20
28 U.S.C. § 1291 ....................................................................................... 1
28 U.S.C. § 1331 ....................................................................................... 1
Fla. Stat. § 11.13 ..................................................................................... 18
Fla. Stat. § 1000.05(4)(a)(1) ................................................................. 3, 4

**Other Authorities**

8 *Works of Thomas Jefferson* (Paul Leicester Ford ed., 1904) ............................ 22

Robert J. Reinstein & Harvey A. Silverglate, *Legislative Privilege and the Separation of Powers*, 86 Harv. L. Rev. 1113 (1973) ........................................................................ 21

Steven F. Huefner, *Congressional Searches and Seizures: The Place of Legislative Privilege*, 24 J.L. & Pol. 271 (2008) .................................................................................. 21, 22

Verney Papers, *Notes of Proceedings in the Long Parliament* (John Bruce ed. 1968) ............ 22

## STATEMENT OF JURISDICTION

Plaintiffs' suit invoked the district court's jurisdiction under 28 U.S.C. § 1331. Movants-Appellants are nonparty members of the Florida Legislature ordered by the district court to produce documents over their objections based on legislative privilege. They appealed the district court's judgment under 28 U.S.C. § 1291 and the collateral order doctrine. *See In re Hubbard*, 803 F.3d 1298, 1305–07 (11th Cir. 2015) (holding that the Court has jurisdiction to hear interlocutory appeals concerning the denial of a governmental privilege). The district court entered its order on February 22, 2023, DE100, and Movants-Appellants filed a timely notice of appeal on February 28. The district court then stayed it order pending appeal. ECF106.

## STATEMENT OF THE ISSUES

**1.**    Whether the district court erred by concluding that "documents containing factually based information used in the decision-making process or disseminated to legislators or committees," including "committee reports, white papers, studies, draft bills, [and] bill analyses," fall outside the scope of the Members' legislative privilege, ECF100 at 18, although Plaintiffs' sole purpose for seeking those documents is to prove that "racial discrimination 'was a motivating factor'" in the Legislature's decision to enact the challenged law, ECF96 at 2 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)).

**2.**    Whether the district court erred by concluding in the alternative that the Members' legislative privilege was qualified (and overcome) in this Section 1983 case although it is well-established that the "parallel concept" of legislative immunity from suit, *EEOC v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 180 (4th Cir. 2011), is "absolute" in Section 1983 cases, *United States v. Gillock*, 445 U.S. 360, 371–72 (1980) (discussing *Tenney v. Brandhove*, 341 U.S. 367 (1951)).

## INTRODUCTION

This appeal arises out of a challenge to Florida's Individual Freedom Act, which, among other things, prohibits state universities from teaching that "[m]embers of one race . . . are morally superior to members of another race." FLA. STAT. § 1000.05(4)(a)(1). The district court preliminary enjoined the law on First Amendment and vagueness grounds, and that order is the subject of a separate appeal. ECF100 at 1. Plaintiffs also allege that the law was enacted with discriminatory intent in violation of the Equal Protection Clause, and discovery regarding that claim has proceeded while the preliminary injunction is on appeal. *Id.* at 2.

Pertinent here, Plaintiffs served subpoenas on fourteen nonparty members of the Florida House of Representatives ("the Members"), instructing them to conduct burdensome searches for documents about the enactment of the Individual Freedom Act. ECF100 at 1–2. The Members moved to quash the subpoenas on legislative-privilege grounds. The district court denied the motion in part, ordering the Members to search for and produce all responsive "documents containing factually based information used in the decision-making process or disseminated to legislators or committees," including "committee reports, white papers, studies, draft bills, [and] bill analyses." *Id.* at 18. Specifically, the district court concluded that those materials fell outside the scope of the Members' legislative privilege, and concluded in the alternative that the privilege was a qualified one that "must yield in this case." *Id.* at 4–9.

3

The district court was wrong on both counts. The legislative privilege enjoyed by state lawmakers is absolute in Section 1983 cases, *see United States v. Gillock*, 445 U.S. 360, 371–72 (1980), and because the sole purpose of Plaintiffs' subpoenas was to probe legislative motive, "[n]one of the relevant information sought in this case could have been outside of the legislative privilege," *In re Hubbard*, 803 F.3d 1298, 1311 (11th Cir. 2015). The district court's contrary decision twice undercuts a doctrine that the Supreme Court has declared "indispensably necessary" in that it "support[s] the rights of the people, by enabling their representatives to execute the functions of their office." *Tenney v. Brandhove*, 341 U.S. 367, 373–74 (1951).

For these reasons, this Court should reverse and remand with instructions to quash the subpoenas in their entirety.

## STATEMENT OF THE CASE

In August 2022, Plaintiffs filed this Section 1983 suit challenging Florida's Individual Freedom Act. That law regulates state universities, prohibiting them from teaching, as part of the State's curriculum, that "[m]embers of one race . . . are morally superior to members of another race." FLA. STAT. § 1000.05(4)(a)(1). Plaintiffs contend that the law imposes viewpoint-based restrictions on instructors in violation of the First Amendment, discriminates on the basis of race in violation of the Equal Protection Clause, and is void-for-vagueness. *See* ECF76 ¶ 9. The district court preliminarily enjoined the law on First Amendment and vagueness grounds, *see* ECF63 at 130, and

that order is the subject of a separate appeal, *see Pernell v. Lamb*, No. 22-13992 (11th Cir.).

Plaintiffs did not seek preliminary injunctive relief on equal-protection grounds. Instead, discovery regarding that claim has continued while the district court's preliminary injunction order is on appeal. ECF100 at 2. Among their discovery efforts, Plaintiffs served subpoenas on fourteen nonparty members of the Florida House of Representatives, instructing them to search "both personal and government devices" for "all documents" responsive to each of eighteen requests on various subjects related to the enactment of the Individual Freedom Act. ECF91-1 at 7, 13. The subpoenas demand, for example, "[a]ny and all notes, memoranda, research, written analysis, white papers, studies, reports, or opinions relied upon, created by, or reviewed by You or Your employees, staff, or representatives regarding H.B. 7's enactment." *Id.* at 16. The subpoenas also demand documents that Plaintiffs apparently believe are related to the Individual Freedom Act, such as "all documents reflecting communications . . . regarding Racial Justice Protests or Black Lives Matter." ECF91-1 at 14. The parties met and conferred regarding the subpoenas, and Plaintiffs proposed a list of more than 70 unique terms to be used in the Members' search for responsive materials, including common words and phrases such as "civil rights" and "abolish." ECF91-3 at 1–2; *see* ECF91-2 at 1.

The Members moved to quash the subpoenas on legislative-privilege grounds because "the only apparent purpose of the subpoenas [wa]s to try to discover evidence

of an improper legislative motive or purpose." ECF91 at 6. The district court granted the motion in part, agreeing "that most of the documents Plaintiffs seek from the Legislators are subject to legislative privilege." ECF100 at 5. But despite agreeing that the purpose of the subpoenas was to "pursu[e] evidence of discriminatory intent," the court denied the motion insofar as the subpoenas sought "purely factual documents, including bill drafts, bill analyses, white papers, studies, and news reports provided by or to the Legislators and their staff members." *Id.* at 2, 6. In the district court's view, those materials "do not fall within the scope of this privilege." *Id.* at 6.

The district court concluded in the alternative that, "[t]o the extent" any of those materials "falls within the scope of Legislative privilege," the privilege is not absolute and "must yield in this case." ECF100 at 7. In making that determination, the court deployed a five-factor balancing test ordinarily used to assess claims of a different privilege—the deliberative-process privilege enjoyed by executive branch officials. *Id.* at 9. After concluding that "the factors are mixed," the district court struck a "balance" by ordering the Members to produce the "purely factual documents" that the court had already determined in the alternative were outside the scope of the privilege. *Id.* at 6, 13. The district court further ordered the Members to search for responsive documents using Plaintiffs' list of more than 70 unique terms, excluding just three terms that the Court determined were unlikely to identify responsive documents. *Id.* at 20.

The Members immediately filed a notice of appeal and sought a stay of the discovery order, which the district court granted. *See* ECF104; ECF105; ECF106.

## STANDARD OF REVIEW

This Court reviews a district court's decision whether to quash a subpoena for abuse of discretion. *In re Hubbard*, 803 F.3d 1298, 1307 (11th Cir. 2015). "A ruling based on an error of law or one that reflects a clear error of judgment is an abuse of discretion." *Id.* It is "an error of law, and therefore an abuse of discretion" to deny a legislative privilege claim without "a proper basis." *Id.* at 1308.

## SUMMARY OF ARGUMENT

Plaintiffs subpoenaed fourteen members of the Florida Legislature seeking to probe their motives in exercising their sovereign power to enact legislation—exactly what the doctrine of legislative privilege is designed to prevent. The district court erred by allowing Plaintiffs to proceed.

**1.** As both Plaintiffs and the district court acknowledged, the sole purpose of the subpoenas was to help "determine whether racial discrimination 'was a motivating factor'" in the Legislature's decision to enact the challenged law. ECF96 at 2 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)); *see* ECF100 at 2. Because "[t]he subpoenas' only purpose was to support the lawsuit's inquiry into the motivation behind" the challenged law, the "factual heart" of Plaintiffs' equal-protection claim "and the scope of the legislative privilege were one and the same: the subjective motivations of those acting in a legislative capacity." *In re Hubbard*, 803 F.3d 1298, 1310–11 (11th Cir. 2015). Accordingly, under this Court's precedent, "[n]one of

7

the relevant information sought in this case could have been outside of the legislative privilege." *Id.* at 1311.

**2.** The district court's alternative conclusion—that the privilege is a qualified one that "must yield in this case," ECF100 at 7—is equally wrong. In Section 1983 cases, legislative privilege is absolute. The Supreme Court made clear more than 70 years ago that "a state legislator's common-law absolute immunity from civil suit survived" the enactment of Section 1983—the statute at issue here—because Congress did not clearly intend otherwise. *United States v. Gillock*, 445 U.S. 360, 372 (1980) (discussing *Tenney v. Brandhove*, 341 U.S. 367 (1951)). Corollary to that doctrine, state lawmakers enjoy a privilege of immunity from compulsory evidentiary process that is "parallel" to their immunity from suit, *EEOC v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 180 (4th Cir. 2011); *see Hubbard*, 803 F.3d at 1307. Both aspects of the privilege serve the same purposes and share the same history. This Court should now join the Fourth and D.C. Circuits in holding that the evidentiary privilege is no less absolute than legislative immunity from suit.

## ARGUMENT

### I. THE DOCUMENTS AT ISSUE FALL SQUARELY WITHIN THE SCOPE OF THE LEGISLATIVE PRIVILEGE.

The district court ordered the Members to produce "purely factual documents, including bill drafts, bill analyses, white papers, studies, and news reports provided by or to the Legislators and their staff members" because they "do not fall within the scope

of" the legislative privilege. ECF100 at 6. In other words, the Court held the privilege simply inapplicable to those documents. That conflicts with this Court's decision in *Hubbard*, which establishes, instead, that subpoenas must be quashed entirely where, as here, their "only purpose [is] to support the lawsuit's inquiry into the motivation behind" the challenged law. *In re Hubbard*, 803 F.3d 1298, 1310–11 (11th Cir. 2015).

As *Hubbard* explains, unlike the attorney-client privilege, which shields particular *materials*, legislative privilege bars a particular type of *inquiry*—"inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts.'" 803 F.3d at 1310 (emphasis omitted) (citation omitted). It is the "claim" that "defines the purpose of the subpoenas, which in turn answers the question of whether the privilege applies." *Id.* at 1311 n.12. Because in *Hubbard* "[t]he subpoenas' only purpose was to support the lawsuit's inquiry into the motivation behind" the challenged law, the court quashed the subpoenas entirely. *Id.* at 1310. In other words, the court rejected a document-by-document approach because, given the subpoenas' purpose, "[n]one of the relevant information sought in this case could have been outside of the legislative privilege." *Id.* at 1311.

*Hubbard*'s categorical approach is consistent with the scope and purpose of the privilege. It "protects the legislative process itself, and therefore covers" all actions "in the sphere of legitimate legislative activity"—that is, "both governors' and legislators' actions in the proposal, formulation, and passage of legislation." *Hubbard*, 803 F.3d at 1308 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)). Unlike other privileges,

"the maintenance of confidentiality is not the fundamental concern of the legislative privilege." *League of Women Voters of Fla., Inc. v. Lee*, 340 F.R.D. 446, 454 (N.D. Fla. 2021) (citation and omitted). Instead, the privilege exists, among other things, to shield legislators and their staff from "inconvenience and distractions," *Tenney*, 341 U.S. at 377, including the "intrusive" distraction of "discovery requests," because "complying with such requests detracts from the performance of official duties," *Hubbard*, 803 F.3d at 1310 (citation omitted). And the privilege serves that purpose whenever it avoids "the distractions of compulsory process," *EEOC v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 180 (4th Cir. 2011) (citation omitted), regardless of the specific documents at issue. The only limiting principle is the "legislative character of the process" that is the subject of the inquiry. *Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007). That is why, for example, "[m]eeting with persons outside the legislature" and "participating in party caucuses" are covered by the privilege (and do not waive its protections) so long as their purpose is "to discuss issues that bear on potential legislation." *Id.*; *see also Bruce v. Riddle*, 631 F.2d 272, 280 (4th Cir. 1980) (same).

As both Plaintiffs and the district court acknowledged, the sole purpose of the subpoenas here was to help "determine whether racial discrimination 'was a motivating factor'" in the Legislature's decision to enact the challenged law. ECF96 at 2 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)); *see* ECF100 at 2 ("Pursuing evidence of discriminatory intent, Plaintiffs subpoenaed documents from thirteen Florida legislators who cosponsored HB 7 in the Florida House of

Representatives and a fourteenth legislator who vocally supported HB 7 in the Florida House of Representatives . . . ."). The documents at issue—"bill drafts, bill analyses, white papers, studies, and news reports provided by or to the Legislators and their staff members"—would be relevant, if at all, not because of their "purely factual" content, ECF100 at 6, but because members reviewed or contributed to the materials, making them (theoretically) probative of legislative motive. Because "[t]he subpoenas' only purpose was to support the lawsuit's inquiry into the motivation behind" the challenged law, the "factual heart" of Plaintiffs' equal-protection claim "and the scope of the legislative privilege were one and the same: the subjective motivations of those acting in a legislative capacity." *Hubbard*, 803 F.3d at 1310–11.

Under this Court's precedent, and under the settled understanding of the scope of legislative privilege, the district court should have concluded that the privilege protects all of the requested documents, even "purely factual documents."[1]

## II.    THE LEGISLATIVE PRIVILEGE IS ABSOLUTE IN SECTION 1983 CASES.

As an alternative to its determination that the materials at issue fall outside the scope of the Members' legislative privilege, the district court also concluded that, even if the materials were privileged, the privilege is in any event a qualified one that may be

---

[1] Even if the district court were correct that the privilege shields only documents "setting out" legislative "motivations and mental impressions," not "purely factual documents," ECF100 at 6, the district court still would have erred because many of the documents at issue—notably, "bill drafts" and "bill analyses"—are written representations of such motivations and mental impressions.

overcome on a case-by-case basis. The court then deployed a five-factor balancing test ordinarily used to assess claims of deliberative-process privilege and concluded that the "privilege must yield in this case." ECF100 at 7–14. That was error because, in Section 1983 cases, the privilege is absolute. The Supreme Court has long held that state legislators are absolutely immune from suit in Section 1983 cases. The corollary doctrine of legislative immunity from compulsory evidentiary process is also absolute.

### A. Precedent and History Support an Absolute Privilege of Legislative Immunity from Compulsory Evidentiary Process in Section 1983 Cases.

**1.** In *Tenney v. Brandhove*, the Supreme Court held that state legislators enjoy a common-law privilege of immunity to suit for their actions "in the sphere of legitimate legislative activity." 341 U.S. at 376. The Court further held that the privilege was absolute, categorically rejecting an exception for cases that, like this one, turn on questions of legislative motive. The plaintiff in *Tenney* had sued members of the California Senate under Section 1983 alleging that certain committee meetings were "not held for a legislative purpose" but to "intimidate and silence" him in violation of the First Amendment and Equal Protection Clause. *Id* at 369–71. As the Court explained, because it "[i]s not consonant with our scheme of government for a court to inquire into the motives of legislators," "[t]he claim of an unworthy purpose does not destroy the privilege." *Id.* at 376–77. Against that backdrop, the Court concluded that Congress did not speak clearly enough in Section 1983's "general language" to abrogate "a tradition so well grounded in history and reason." *Id.* at 376. In other words, as the

Supreme Court later summarized, *Tenney* "h[olds] that a state legislator's common-law absolute immunity from civil suit survived the passage of the Civil Rights Act of 1871." *United States v. Gillock*, 445 U.S. 360, 372 (1980).

As this Court explained in *Hubbard*, "the privilege [of immunity to suit] extends to discovery requests, even when the lawmaker is not a named party in the suit," because "complying with such requests detracts from the performance of official duties." 803 F.3d at 1310 (citing *Wash. Suburban Sanitary Comm'n*, 631 F.3d at 181). Because the plaintiffs had "not presented a cognizable" claim, there could be no basis "to justify intruding upon the" evidentiary privilege. *Id.* at 1313. The Court therefore had no occasion to address whether the evidentiary privilege, like the immunity from suit, is absolute. *See id.* at 1312 n.13 ("Our decision should not be read as deciding whether, and to what extent, the legislative privilege would apply to a subpoena in a private civil action based on a different kind of constitutional claim than the one AEA made here."). The Court did, however, appropriate its framework for the evidentiary privilege from the Supreme Court's absolute immunity cases. *See id.* at 1307–09. For the reasons discussed below, the Court should now join the Fourth and D.C. Circuits by clarifying what that appropriation strongly suggests—that, in civil cases, "the legislative privilege is 'absolute' where it applies at all." *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 416 (D.C. Cir. 1995) (citation omitted); *see Burtnick v. McLean*, 76 F.3d 611, 613 (4th

Cir. 1996) (holding that nonparty board members could not be compelled to testify in violation of their "absolute immunity when acting in a legislative capacity").[2]

**2.** The decision below, which recognizes the legislative privilege of absolute immunity from suit while holding that the privilege may be balanced away, rests on the unfounded assumption that "the [evidentiary] privilege is weaker than . . . immunity from suit." *Brown & Williamson Tobacco Corp.*, 62 F.3d at 418. Properly understood, however, immunity "from suit" and immunity "against compulsory evidentiary process" are "parallel concept[s]" with the same rationales and historical underpinnings. *Wash. Suburban Sanitary Comm'n*, 631 F.3d at 180. Because the privilege of immunity from suit is absolute, it should follow that the corollary evidentiary privilege is absolute as well.

---

[2] Several district courts (including the court below) have held the privilege in Section 1983 cases to be a qualified one. Of the federal appellate courts, only the Fifth Circuit—in a conclusory paragraph with no explanation or rationale—has suggested approval of that approach. *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 624 (5th Cir. 2017). Like this Court, the First and Ninth Circuits have flagged but not yet resolved the issue. *See Am. Trucking Ass'ns, Inc. v. Alviti*, 14 F.4th 76, 90 (1st Cir. 2021) ("[E]ven assuming that a state's legislative privilege might yield in a civil suit brought by a private party in the face of an important federal interest, the need for the discovery requested here is simply too little to justify such a breach of comity." (emphasis added)); *Lee v. City of L.A.*, 908 F.3d 1175, 1187 (9th Cir. 2018) ("Although the Supreme Court has not set forth the circumstances under which the privilege must yield to the need for a decision maker's testimony, it has repeatedly stressed that judicial inquiries into legislative . . . motivation represent a substantial intrusion such that calling a decision maker as a witness is therefore usually to be avoided.'" (citing *Vill. of Arlington Heights*, 429 U.S. at 268 n.18) (cleaned up)).

14

This Court has joined the Fourth and D.C. Circuits in recognizing the kinship between those concepts. As those courts have explained, immunity from suit "shields [legislators] from political wars of attrition in which their opponents try to defeat them through litigation rather than at the ballot box," and the "privilege against compulsory evidentiary process exists to safeguard [lawmakers'] immunity and to further encourage the republican values it promotes." *Id.* at 181 (citation omitted); *see MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 859 (D.C. Cir. 1988) (same).

This Court has agreed, explaining in *Hubbard* that the privilege "ensures that civil litigation will not create a distraction and force Members to divert their time, energy, and attention from their legislative tasks," and "the privilege extends to discovery requests, even when the lawmaker is not a named party in the suit" because "complying with such requests detracts from the performance of official duties" all the same. 803 F.3d at 1310 (quoting *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975)). A "litigant does not have to name members or their staffs as parties to a suit in order to distract them from their legislative work." *Id.* (quoting *MINPECO, S.A.*, 844 F.2d at 859). Because "[d]iscovery procedures can prove just as intrusive," *id.* (quoting *MINPECO, S.A.*, 844 F.2d at 859), this Court has concluded that "[t]he privilege applies with *full force* against requests for information about the motives for legislative votes and legislative enactments," *id.* (emphasis added). That is so only if the evidentiary privilege, like the immunity from suit, is absolute.

The district court nevertheless held that the privilege is subject to "a five-factor balancing test to determine whether the legislative privilege must yield to Plaintiffs' need for the evidence they seek." ECF100 at 9.[3] If that ruling is allowed to stand, the privilege not only fails to "appl[y] with full force" against discovery requests, *Hubbard*, 803 F.3d at 1310, but has little value in that context whatsoever.

Consider this case: Plaintiffs served subpoenas on fourteen members of the Florida House of Representatives instructing the Members to search "both personal and government devices" for "all documents" responsive to each of eighteen sweeping requests on various subjects related to the legislation at issue, some quite tangentially related to that legislation. ECF91-1 at 7, 13. The district court narrowed the universe of responsive materials by ordering the Members to produce only "documents containing factually based information used in the decision-making process." ECF100 at 20. But that did nothing to mitigate the burden on the Members themselves, who remain responsible for searching both their personal and government devices using dozens of terms—including such common words and phrases as "civil rights" and "abolish," ECF91-3 at 1–2[4]—and reviewing the hits to identify responsive documents. It is no

---

[3] The factors are "(1) whether the evidence Plaintiffs seek is relevant, (2) whether other evidence is available, (3) whether the litigation is sufficiently 'serious,' (4) whether the government is involved in the litigation, and (5) whether upholding the subpoena defeats the legislative privilege's purpose." ECF100 at 9 (footnote omitted).

[4] *See* ECF100 at 20 (ordering the Members to use "the search terms identified at ECF91-3 at 1–2," with just a few minor modifications).

16

answer that some of that burden may fall to legislative staff, as "the day-to-day work of . . . aides is so critical to the Members' performance that they must be treated as the latter's alter egos." *Gravel v. United States*, 408 U.S. 606, 616–17 (1972).

The potential chilling effect of the district court's order is massive. The Florida Legislature enacts many laws each year, some of which generate significant public controversy, up to and including litigation. For example, in the last few years, plaintiffs have filed at least seventeen Section 1983 cases challenging Florida legislation on grounds that call into question legislative motive.[5] If the district court's order is allowed to stand, what is to stop the plaintiffs in every future equal-protection challenge to a Florida statute from subpoenaing the entire majority caucus of the Florida Legislature

---

[5] Complaint at ¶¶ 108–24, *M.A. v. State Bd. of Ed.*, No. 22-cv-0134 (N.D. Fla. Mar. 31, 2022); Complaint at ¶¶ 1, 40–46, *Cousins v. Orange Cnty.*, No. 22-cv-1313 (M.D. Fla. July 25, 2022); Complaint at ¶¶ 160–64, *Pernell v. Lamb*, No. 22-cv-304 (N.D. Fla. Aug. 18, 2022); Verified Complaint at ¶¶ 70–82, *Novoa v. Diaz*, No. 22-cv-324 (N.D. Fla. Sept. 6, 2022); Complaint at ¶¶ 40–47, 96, *Honeyfund.com v. DeSantis*, No. 22-cv-227 (N.D. Fla. June 22, 2022); Complaint at ¶ 62–66, *Falls v. DeSantis*, No. 22-cv-0166 (N.D. Fla. Apr. 22, 2022); Complaint at ¶¶ 5, 56–66, 100–07, *Dream Defenders v. DeSantis*, 21-cv-0191 (N.D. Fla. May 11, 2021); Complaint at ¶¶ 39–41, 66–75, *D.N. v. Florida State Bd. of Ed.*, No. 21-cv-61344 (S.D. Fla. June 28, 2021); Complaint at ¶ 85, *Netchoice v. Moody*, No. 21-cv-220 (N.D. Fla. May 27, 2021); Complaint at ¶¶ 32–47, *Common Cause v. Byrd*, No. 22-cv-109 (N.D. Fla. Mar. 11, 2022); Complaint at ¶¶ 144–65, *City of S. Miami v. DeSantis*, No. 19-cv-22927 (S.D. Fla. July 16, 2019); Complaint at ¶¶ 56, 138, *League of Women Voters of Florida v. Lee*, No. 21-cv-186 (N.D. Fla. May 6, 2021); Complaint at ¶¶ 120–41, *NAACP v. Lee*, No. 21-cv-187 (N.D. Fla. May 6, 2021); Complaint at ¶¶ 13, 157, *Florida Rising Together v. Lee*, No. 21-cv-201 (N.D. Fla May 17, 2021); Complaint at ¶ 118, *Harriet Tubman Freedom Fighters Corp. v. Lee*, No. 21-cv-242 (N.D. Fla. June 14, 2021); Complaint at ¶ 8, *Jones v. DeSantis*, No. 19-cv-300 (N.D. Fla. June 28, 2019); Complaint at ¶¶ 40, 62, *McCoy v. DeSantis*, No. 19-cv-304 (N.D. Fla. July 1, 2019).

demanding all documents that mention "race" or anything related to it? With a sprinkle of luck and a five-factor balancing test in their back pocket, they just might get it. And knowing that, members will either "divert their time, energy, and attention from their legislative tasks" as this Court warned, *Hubbard*, 803 F.3d at 1310, or—worse— members will distort the legislative process to avoid being subpoenaed in the first place, for example, by foregoing controversial legislative choices or deliberations, *see Bogan v. Scott-Harris*, 523 U.S. 44, 52 (1998) ("[T]he exercise of legislative discretion should not be inhibited by judicial interference."). Collectively, these problems may "significantly deter service" altogether. *Id.* at 52. After all, "[o]ne must not expect uncommon courage even in legislators." *Tenney*, 341 U.S. at 377.

These concerns are especially pronounced in states like Florida, "where the part-time citizen-legislator remains commonplace." *Bogan*, 523 U.S. at 52. The Florida Legislature convenes for regular session just 60 days a year, and state law provides only part-time compensation for legislative service, necessitating that members pursue other full-time employment. *See* FLA. CONST. Art. III, § 3; *see also* FLA. STAT. § 11.13. Given the short window for the Legislature to complete its business, interference during that time is especially problematic. Beyond that, however, members must on a year-round basis meet with constituents and engage with policy, while also earning a living, fulfilling family obligations, and (as a practical matter) campaigning for re-election. Taking those considerations together, the prospect of members being routinely forced under penalty of perjury to search for and produce evidence for the purpose of impugning their own

motives for any of their many legislative acts cannot be taken lightly. Absolute immunity, both from suit and from compulsory evidentiary process, is necessary to give them "the breathing room necessary to" do the people's work and "make [policy] choices in the public's interest, in a way "[un]inhibited . . . [and] [un]distorted." *Wash. Suburban Sanitary Comm'n*, 631 F.3d at 181 (citing *Bogan*, 523 U.S. at 52).

**3.** Precedent supports absolute legislative immunity from compulsory evidentiary process in Section 1983 cases not only because that concept serves the same purposes as absolute legislative immunity from suit, but also because both aspects of the privilege for state lawmakers are "constitutionally based" in that they "ha[ve] been patterned after immunity under the Speech or Debate Clause." *Dennis v. Sparks*, 449 U.S. 24, 30 (1980); *see also Hubbard*, 803 F.3d at 1310 n.11. And it is well-established that the evidentiary privilege enjoyed by congressmen under the Speech or Debate Clause is no less absolute than their immunity from suit. *See Brown & Williamson Tobacco Corp.*, 62 F.3d at 421.

> As the D.C. Circuit has explained:
>
> A party is no more entitled to compel congressional testimony—or production of documents—than it is to sue congressmen. We do not perceive a difference in the vigor with which the privilege protects against compelling a congressman's testimony as opposed to the protection it provides against suit.

*Id.* The court thus rejected the argument that "the [evidentiary] privilege is weaker than . . . immunity from suit," explaining that:

> Looking only to the text of the Constitution, we would be inclined to conclude that, if anything, appellant has it backwards. The Clause says nothing specifically about lawsuits; what it does say is that members of

Congress "shall not be *questioned* in any other place" about legislative actions. U.S. Const. art. I, § 6, cl. 1 (emphasis added). Based on the text of the Constitution, it would seem that the immunity from suit derives from the [evidentiary] privilege, not the other way around.

*Id.* at 418.

That reasoning applies with equal force to state lawmakers because, except in "criminal actions," the Supreme Court "generally ha[s] equated the legislative immunity to which state legislators are entitled under § 1983 to that accorded Congressmen under the Constitution." *Supreme Court of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 733 (1980) (citations omitted); *Dennis*, 449 U.S. at 30. This Court has done the same. *See Hubbard*, 803 F.3d at 1310 n.11. And for good reason. Federal and state legislators may be different in that, for the former, legislative privilege "was written into the Articles of Confederation and later into the Constitution." *Tenney*, 341 U.S. at 372. But the Speech or Debate Clause "was a reflection of political principles already firmly established in the States." *Id.* at 373. After the Revolution of 1688, the English Bill of Rights declared that "'the freedom of speech, and debates, and proceedings in Parliament, ought not to be impeached or questioned in any court or place out of Parliament.'" *Kilbourn v. Thompson*, 103 U.S. 168, 202 (1880). "Many of the colonies" had "similar provisions in their charters or in bills of rights," and "the general idea in all of them, however expressed, must have been the same." *Id.* "As first the American colonies, and then the United States, adopted their own founding charters, they incorporated a legislative privilege essentially identical to the one contained in the English Bill of

Rights." Steven F. Huefner, *Congressional Searches and Seizures: The Place of Legislative Privilege*, 24 J.L. & POL. 271, 281 (2008) (footnote omitted). Thus, for both federal and state legislators, the privilege has the same origins and thus operates the same way, *see Consumers Union of U.S., Inc.*, 446 U.S. at 733; *Dennis*, 449 U.S. at 30.

And nothing in the privilege's "taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries," *Tenney*, 341 U.S. at 372, suggests that the privilege was (or should be now) anything less than absolute, regardless of the nature of a particular intrusion into the legislative process. The Bill of Rights of 1689 extended the privilege well beyond even freedom from judicial intervention, providing that lawmakers "ought not to be impeached or questioned in any court *or place out of Parliament*." *Kilbourn*, 103 U.S. at 202 (emphasis added). The breadth of that language reflects the history that led to its adoption: "The methods of intimidation employed by the Crown and objected to by Parliament as a breach of privilege took a wide variety of forms." Robert J. Reinstein & Harvey A. Silverglate, *Legislative Privilege and the Separation of Powers*, 86 HARV. L. REV. 1113, 1127 (1973). "The Crown's arsenal included the practices of issuing direct orders to the Speaker to cease debate on sensitive topics, . . . summarily arresting others and arraigning them before the Star Chamber and other secret, inquisitorial bodies, or committing them directly to the Tower of London." *Id.* (footnote omitted).

The privilege enshrined in 1689 thus guarded equally against "question[ing] in any . . . place out of Parliament." *Kilbourn*, 103 U.S. at 202. Against that backdrop, there

is certainly no basis to conclude that members of Parliament would have tolerated the compelled disclosure of legislative materials on a case-by-case basis, so long as the Crown beat them in an interest-balancing contest. Indeed, one of the key royal provocations leading up to the English Civil War was King Charles's seizure of the legislative papers of two members of Parliament as part of an attempt to have both men arrested. *See* Verney Papers, NOTES OF PROCEEDINGS IN THE LONG PARLIAMENT 137–38 (John Bruce ed. 1968). To "defend the priviledges of [P]arliment," the members responded with force to both aspects of the intrusion. *Id.* at 138. Although the papers had been "sealed" "by warrant under the [K]ing's hand," the House of Commons sent a "serjeant at armes to arrest those that did it," and both Commons and Lords "sent to breake oppen the seales," which "was donn accordingly." *Id.* Almost a week later, the still-incensed House resolved "[t]hat the priviledg of [P]arliment . . . cannot bee fully vindecated unlesse the [K]ing will discover who advised him to seall upp the trunks," "that such persons may have exemplary punishment." *Id.* at 141.[6]

---

[6] "Although very little historical material exists specifically about the Framers'" understanding of the privilege, Huefner, *supra* at 281 (footnote omitted), Thomas Jefferson expressed a view consistent with the English experience—"that in order to give to the will of the people the influence it ought to have," their representatives "should be free from the cognizance or coercion of the coordinate branches" and "their communications with their constituents should of right, as of duty also, be free, full, and unawed by any," 8 WORKS OF THOMAS JEFFERSON 322–23 (Paul Leicester Ford ed., 1904), *available at* https://oll.libertyfund.org/title/ford-the-works-vol-8-correspondence-1793-1798.

\*     \*     \*

For the reasons discussed above, the Court should hold that, in Section 1983 cases, state lawmakers' privilege of absolute immunity from compulsory evidentiary process is no less absolute than their privilege of immunity from suit. That is by far the better view in light of precedent, history, and the shared purposes underlying both aspects of the privilege.

**B. The Arguments for Qualifying the Privilege Are Unsound.**

**1.** The district court subjected the privilege claims here to judicial balancing on the strength of the Supreme Court's statement in *United States v. Gillock* that the privilege may yield "where important federal interests are at stake, as in the enforcement of federal criminal statutes." *Gillock*, 445 U.S. at 373; *see* ECF100 at 7. In context, however, that was a reference to the government's sovereign interest in a federal criminal prosecution. As discussed above, when it decided *Gillock*, the Supreme Court had already held in *Tenney* that "a state legislator's common-law . . . immunity from civil suit" under Section 1983—the statute at issue here—is "absolute." *Gillock*, 445 U.S. at 372. In *Gillock*, the Court reaffirmed that principle, distinguishing *Tenney* not (as the district court would have it) because the evidentiary privilege is in some sense weaker than "immunity from civil suit," but because "*Tenney* and subsequent cases on official immunity have drawn the line at civil actions." *Id.* at 372–73 (footnote omitted). That the Court drew that comparison in *Gillock* only underscores that the privilege is absolute in Section 1983 cases.

23

The privilege yielded in *Gillock* not because of any general rule that the privilege can be balanced away depending on the facts, but rather because Congress abrogated the privilege when it made bribery a federal crime. *Gillock* was a federal bribery prosecution in which the defendant, a state lawmaker, "mov[ed] to suppress all evidence relating to his legislative activities" on grounds of legislative privilege. 445 U.S. at 363. *Gillock* was very different from *Tenney* because, among the privilege's "historic roots" and "interrelated rationales," *id.* at 369, 373, was a long tradition of "prosecutions of state and local officials, including state legislators, using evidence of their official acts," *id.* at 373 n.11. Thus, absolute civil immunity "presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials." *Id.* at 372. The Court thus drew "the line at civil actions." *Id.* at 373 & n.11; *see also Hubbard*, 803 F.3d at 1311–12 ("[F]or purposes of the legislative privilege, there is a fundamental difference between civil actions by private plaintiffs and criminal prosecutions by the federal government.").

*Gillock* was, moreover, no ordinary criminal case. The government sought to enforce an act of Congress that specifically required proof of official acts and was therefore unmistakably intended to abrogate any otherwise applicable common-law governmental privilege that might stand in the way. As the Court explained, "the Supremacy Clause dictates that federal enactments will prevail over competing state exercises of power," *Gillock*, 445 U.S. at 370, and Congress had acted "to make state [legislators], like all other persons, subject to federal criminal sanctions," *id.* at 374.

24

Given that circumstance, the Court "discern[ed] no basis . . . for a judicially created limitation that handicaps proof of the relevant facts." *Id. Tenney*, by contrast, was a private civil case brought under a statute that *did not* clearly abrogate the privilege. *See id.* at 372–73.

*Gillock*'s rationale thus does not support qualifying the privilege in civil cases at all, much less in cases brought under Section 1983, a context in which *Gillock* itself recognizes that the privilege is absolute. To the extent *Gillock* says anything more about civil cases, it stands at most for the unremarkable proposition that Congress may abrogate or modify the privilege. *See Brown & Williamson Tobacco Corp.*, 62 F.3d at 419–20 ("[S]ensitivities to the existence of criminal proceedings . . . suggest that the testimonial privilege might be less stringently applied when inconsistent with a sovereign interest, but is 'absolute' in all other contexts."). As the Court made clear in *Tenney*, however, Congress did not do so in Section 1983.

**2.** In arguing for a qualified privilege below, Plaintiffs pointed to *Arlington Heights* for its statement that in "some extraordinary instances the members [of a governmental body] might be called to the stand at trial to testify concerning the purpose of the official action," cautioning that "even then such testimony frequently will be barred by privilege." 429 U.S. at 268; *see* ECF96 at 7. Plaintiffs seized upon that lone cryptic sentence to support their view that legislative privilege must sometimes yield, even in Section 1983 cases.

25

In context, however, the statement is no grand pronouncement of a qualification on the legislative privilege specifically, but simply recognizes the obvious proposition that some governmental privileges, some of the time, will not operate to preclude testimony that is otherwise within their scope. For example, the statement refers not only to legislative privilege, but more generally to "members" of governmental bodies and their "privilege." Some governmental privileges are indeed qualified and thus will not always bar an official's testimony. That reading of the statement is confirmed by the pair of citations appended to it—*Tenney v. Brandhove*, which (as discussed above) establishes the absolute legislative immunity of state officials in Section 1983 cases, and *United States v. Nixon*, 418 U.S. 683 (1974), which rejects absolute executive privilege in a federal criminal case. Even insofar as the statement speaks to legislative privilege, the view among the circuit courts at the time was that the common-law privilege *Tenney* recognized for state legislators did not extend to regional or local officials like the board members in *Arlington Heights. See, e.g.*, *Nelson v. Knox*, 256 F.2d 312, 314 (6th Cir. 1958). It was not until years later that the Supreme Court extended the privilege to those officials. *See Bogan*, 523 U.S. at 49 (1998) (local officials); *Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 405 (1979) (regional officials). Nor in any event would even absolute legislative privilege bar an official from voluntarily taking the stand.

Thus, when *Arlington Heights* was decided, there were many and varied circumstances in which an official might have testified without diluting the absolute privilege of state legislators, so it was fair to say that official testimony would

"frequently," not necessarily always, "be barred by privilege." 429 U.S. at 268. Given that, there is no basis to read the statement as implicitly limiting the Supreme Court's prior holding in *Tenney* that legislative privilege is absolute in Section 1983 cases. The better reading is that the statement was merely a caution to Section 1983 plaintiffs that they should look to other forms of proof because, even in "extraordinary instances," testimony by governmental officials "frequently will be barred by privilege." 429 U.S. at 268.

**3.** Underlying the district court's decision to subject the privilege claims here to judicial balancing is the assumption that legislative privilege is in key respects similar to the deliberative-process privilege from which the district court borrowed its approach. *See* ECF100 at 12. That assumption is deeply flawed.

The deliberative-process privilege allows executive branch officials "to withhold documents and other materials that would reveal advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (internal quotation marks omitted). Legislative privilege, too, shields a subset of government officials from compulsory evidentiary process within a certain scope. But that is where the similarities end.

All governmental privileges protect important interests, but the historical pedigree and "practical import" of the legislative privilege are "difficult to overstate." *Wash. Suburban Sanitary Comm'n*, 631 F.3d at 181. The privilege affords the members of

27

the "most representative branch" the "breathing room necessary to" make our "toughest decisions," including "the content of the laws that will shape our society" and "the size, structure, and staffing of the executive and administrative bodies carrying them out." *Id.* The privilege is thus "indispensably necessary" "to support the rights of the people, by enabling their representatives to execute the functions of their office." *Tenney*, 341 U.S. at 373–74.

Consistent with the special status that it occupies, several features are unique to the legislative privilege enjoyed by state lawmakers. For starters, the privilege of immunity to suit is absolute, and the evidentiary privilege is corollary to that absolute immunity. *See Gillock*, 445 U.S. at 372. The deliberative-process privilege is materially different in that important respect, as no common-law immunity doctrine broadly shields state executive branch officials from official-capacity claims.[7] Even when sued in their individual capacity, most such officials enjoy only qualified immunity. *See Nixon v. Fitzgerald*, 457 U.S. 731, 746 (1982).[8] As the Supreme Court explained in *Mitchell v. Forsyth*, "[t]he legislative immunity recognized in *Tenney v. Brandhove*" was "a presupposition of our scheme of representative government." 472 U.S. at 521. There is

---

[7] The Eleventh Amendment permits suits for prospective injunctive relief against those "sufficiently connected [] with the duty of enforcement" of a challenged state law. *Ex parte Young*, 209 U.S. 123, 161 (1908).

[8] "[A]n official sued in his official capacity may not take advantage of a qualified immunity defense." *Mitchell v. Forsyth*, 472 U.S. 511, 556 n.10 (1985).

"no analogous historical or common-law basis for an absolute immunity for" general executive functions. *Id.* (no absolute immunity for the Attorney General's national security duties).

Indeed, legislative immunity stands virtually alone in that it is an absolute bar to both official-capacity and individual-capacity claims. *See Scott v. Taylor*, 405 F.3d 1251, 1254–56 & n.4 (11th Cir. 2005). Ordinarily, "a government official sued in his individual capacity may be entitled to various personal immunity defenses," and "such personal immunity defenses are unavailable" in "an official capacity suit," which is "generally treated as a suit against the underlying governmental entity." *Id.* at 1254. But because "a private civil action, whether for an injunction or damages, creates a distraction and forces legislators to divert their time, energy, and attention from their legislative tasks," legislators are absolutely immune from suit "regardless of the capacity in which [they are] sued." *Id.* at 1256 (cleaned up).

Underscoring the unique role played by legislative immunity, even prosecutors and judges do not enjoy common-law immunity from suit in their official capacity. *See Burge v. Par. of St. Tammany*, 187 F.3d 452, 466–67 (5th Cir. 1999) (holding that prosecutors' "individual immunity is not available in an official capacity suit"); *Pulliam v. Allen*, 466 U.S. 522, 536 (1984) ("We never have had a rule of absolute judicial immunity from prospective relief.").[9] In a similar vein, the Supreme Court has

_____

[9] *See also VanHorn v. Oelschlager*, 502 F.3d 775, 779 (8th Cir. 2007) ("[A]bsolute, quasi-judicial immunity is not available for defendants sued in

contrasted legislators with judges in that the latter may be "required to testify about their judicial conduct in third–party litigation." *Dennis*, 449 U.S. at 30. That legislators alone may not be sued at all—in any capacity,[10] for any form of relief,[11] no matter their motives[12]—brings into sharp relief the unique status the courts have afforded lawmakers' "time, energy, and attention [to] their legislative tasks." *Hubbard*, 803 F.3d at 1310. And it is therefore unsurprising that legislators enjoy an absolute evidentiary privilege while other officials enjoy only a qualified privilege.

\*      \*      \*

Everything the Supreme Court has ever said about the legislative privilege enjoyed by state lawmakers confirms that, in Section 1983 cases, their privilege of immunity from compulsory evidentiary process is no less absolute than their immunity to suit. *United States v. Gillock*, the one Supreme Court decision on which the district court relied to qualify the privilege, confirms that, if anything, the privilege is absolute in Section 1983 cases and qualified only in the very limited sense that the privilege may yield in a wholly different universe of cases—those where Congress abrogated the

---

their official capacities."); *Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*, 229 F.3d 478, 483 (5th Cir. 2000) ("[A]bsolute quasi-judicial immunity" is "unavailable in official-capacity suits.").

[10] *Scott*, 405 F.3d at 1254–56 & n.4.

[11] *Id.* at 1256.

[12] *See Tenney*, 341 U.S. at 376–77.

privilege, as in a federal bribery prosecution. That conclusion is bolstered by decisions of the Fourth and D.C. Circuits, as well as this Court's explanation of the privilege in *Hubbard*. That the district court had to appropriate its contrary approach from a smattering of other district courts applying the fundamentally different concept of the deliberative-process privilege only underscores the point.

## CONCLUSION

For the foregoing reasons, the Court should reverse and remand with instructions to quash the subpoenas in their entirety.

Respectfully submitted,

ASHLEY MOODY
  *Attorney General*

HENRY C. WHITAKER
  *Solicitor General*
*/s/ Daniel W. Bell*
DANIEL W. BELL
  *Chief Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF FLORIDA
PL-01 The Capitol
Tallahassee, FL 32399
(850) 414-3300
*daniel.bell@myfloridalegal.com*

DAVID AXELMAN
  *General Counsel*
J. MICHAEL MAIDA
  *Deputy General Counsel*
THE FLORIDA HOUSE OF
REPRESENTATIVES
329 The Capitol
Tallahassee, FL 32399
(850) 717-5500
*david.axelman@myfloridahouse.gov*

April 17, 2023

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 7,969 words.

2.      This document complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

*/s/ Daniel W. Bell*
Daniel W. Bell

33

## CERTIFICATE OF SERVICE

I certify that on April 17, 2023, I electronically filed the foregoing Brief with the Clerk of Court by using the Court's CM/ECF system, which will send a notice of electronic filing to all parties in the case who are registered through CM/ECF.

*/s/ Daniel W. Bell*
Daniel W. Bell