**23-10616**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT
_____

### LEROY PERNELL, et al.,

*Plaintiffs-Appellees,*

v.

### ROBERT ANDRADE, et al.,

*Movants-Appellants.*
_____

**On Appeal from the U.S. District Court for the Northern District of Florida
Case No.:  4:22-cv-304-MW-MAF**
_____

### APPELLEES' PETITION FOR REHEARING EN BANC
_____

Jerry C. Edwards
ACLU FOUNDATION OF FLORIDA
933 Lee Road, Suite 102
Orlando, FL 32810
(786) 363-1107
jedwards@aclufl.org

Morenike Fajana
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, Fl. 5
New York, NY 10005
(212) 217-1690
mfajana@naacpldf.org

Leah Watson
Sarah Hinger
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., Fl. 18
New York, NY 10004
(212) 549-2500
lwatson@aclu.org
shinger@aclu.org

Jason Leckerman
BALLARD SPAHR, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
(215) 864-8266
leckermanj@ballardspahr.com

*Counsel for Plaintiffs-Appellees*

## <u>CERTIFICATE OF INTERESTED PERSONS AND</u>
## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Eleventh Circuit Rule 35-5(b), Appellees certify to the best of their knowledge that the following individuals and entities may have an interest in the outcome of this case or appeal:

1. Almond, Russell, *Plaintiff-Appellee*

2. Altizer, Tiffany, *Defendant*

3. Alvarez, Cesar L., *Defendant*

4. Alvarez, Maximo, *Defendant*

5. American Civil Liberties Union of Florida, *Counsel for Plaintiffs-Appellees*

6. American Civil Liberties Union, *Counsel for Plaintiffs-Appellees*

7. Andrade, Robert, *Movant-Appellant*

8. Armas, Jose J., *Defendant*

9. Austin, Sharon Wright, *Plaintiff-Appellee*

10. Axelman, David, *Counsel for Movants-Appellants*

11. Azis, Jacqueline Nicole, *Counsel for Plaintiffs-Appellees*

12. Ballard, Kathryn, *Defendant*

13. Ballard Spahr LLP, *Counsel for Plaintiffs-Appellees*

14. Baumgardner, Sara, *Counsel for Amicus Curiae the State of Texas*

15. Bell, Daniel, *Counsel for Movants-Appellants*

16. Bell, Melony*, Movant-Appellant*

17. Bell, Zachary Chandler, *Defendant*

18. Bird, Brenna, *Counsel for Amicus Curiae the State of Iowa*

19. Blakenship, Katherine, *Counsel for Plaintiffs-Appellees*

20. Boaz, Timothy, *Defendant*

21. Borrero, David, *Movant-Appellant*

22. Brandon, David L., *Defendant*

23. Butchey, Deanne, *Defendant*

24. Burgess, Tiffani, *Counsel for Plaintiffs-Appellees*

25. Callahan, Sandra, *Defendant*

26. Cameron, Daniel, *Counsel for Amicus Curiae the State of Kentucky*

27. Carr, Christopher M., *Counsel for Amicus Curiae the State of Georgia*

28. Carrere, Michael, *Defendant*

29. Cavazos, Ann Marie, *Defendant*

30. Cerio, Timothy, *Defendant*

31. Chicken, Eric, *Defendant*

32. Christy, Bill, *Defendant*

33. Cliatt, II, Otis, *Defendant*

34. Cole, Richard P., *Defendant*

35. Cole, William F., *Counsel for Amicus Curiae the State of Texas*

36.    Coleman, Santino, *Counsel for Plaintiffs-Appellees*

37.    Collins, Peter, *Defendant*

38.    Colson, Dean S., *Defendant*

39.    Condello, Jeff, *Defendant*

40.    Conte, Joseph, *Defendant*

41.    Cooper & Kirk, PLLC, *Counsel for Defendants*

42.    Cooper, Charles J., *Counsel for Defendants*

43.    Corcoran, Richard, *Defendant*

44.    Corr, Christopher T., *Defendant*

45.    Dauphin, Johana, *Plaintiff-Appellee*

46.    De Las Cuevas-Diaz, Vivian, *Defendant*

47.    Diaz, Jr., Manny, *Defendant*

48.    Donnelly, N. Rogan, *Defendant*

49.    Dorsey, Dana, Thompson, *Plaintiff-Appellee*

50.    Dortch, Jr., Thomas W., *Defendant*

51.    Drummond, Gentner, *Counsel for Amicus Curiae the State of Oklahoma*

52.    Duart, Carlos A., *Defendant*

53.    Dubose, Michael, *Defendant*

54.    Dunn, Marvin, *Plaintiff-Appellee*

55.    Edge, Aubrey, *Defendant*

56.    Edinger, Gary, *Counsel for Plaintiffs-Appellees* in *Novoa v. Diaz*, No. 22-13994

57.    Edwards, Jerry, *Counsel for Plaintiffs-Appellees*

58.    Ezray, Evan, *Counsel for Movants-Appellants*

59.    Fajana, Morenike, *Counsel for Plaintiffs-Appellees*

60.    Fernandez-Barquin, Juan, *Movant-Appellant*

61.    Fine, Randy, *Movant-Appellant*

62.    First Amendment Forum at University of South Florida, *Plaintiff-Appellee* in *Novoa v. Diaz*, No. 22-13994

63.    Fitch, Lynn, *Counsel for Amicus Curiae the State of Mississippi*

64.    Fitzpatrick, Magistrate Judge Martin A., U.S. District Court for the Northern District of Florida

65.    Florida A&M University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

66.    Florida Board of Governors of the State University System, *Defendant (Dismissed on Nov. 22, 2022)*

67.    Florida International University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

68.    Florida Office of the Attorney General, *Counsel for Movants-Appellants*

69. Florida State Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

70. Foundation for Individual Rights and Expression, *Counsel for Plaintiffs-Appellees* in *Novoa v. Diaz*, No. 22-13994

71. Frost, Patricia, *Defendant*

72. Gabadage, Nimna, *Defendant*

73. Gaekwad, Danny, *Defendant*

74. Gary S. Edinger & Associates PA – Gainesville FL, *Counsel for Plaintiffs-Appellees* in *Novoa v. Diaz*, No. 22-13994

75. Gonzalez, Jorge, *Defendant*

76. Greubel, Greg, *Counsel for Plaintiffs-Appellees* in *Novoa v. Diaz*, No. 22-13994

77. Griffin, Michael, *Defendant*

78. Griffin, Tim, *Counsel for Amicus Curiae the State of Arkansas*

79. Haddock, Edward, *Defendant*

80. Harper, Kristin, *Defendant*

81. Heavener, James W., *Defendant*

82. Henderson, Jim W., *Defendant*

83. Hilgers, Michael T., *Counsel for Amicus Curiae the State of Nebraska*

84. Hinger, Sarah Ann, *Counsel for Plaintiffs-Appellees*

85. Hosseini, Morteza, *Defendant*

86.  Horton, Oscar, *Defendant*

87.  Jackley, Marty J., *Counsel for Amicus Curiae the State of South Dakota*

88.  Johnson, Alexsis Marie, *Counsel for Plaintiffs-Appellees*

89.  Jones, Ken, *Defendant*

90.  Jordan, Darlene Luccio, *Defendant*

91.  King, Stephen, *Defendant*

92.  Knudsen, Austin, *Counsel for Amicus Curiae the State of Montana*

93.  Kuntz, Thomas G., *Defendant*

94.  Labrador, Raúl, *Counsel for Amicus Curiae the State of Idaho*

95.  Lamb, Brian, *Defendant*

96.  Landry, Jeff, *Counsel for Amicus Curiae the State of Louisiana*

97.  Lawson, Kevin, *Defendant*

98.  Leckerman, Jason Allen, *Counsel for Plaintiffs-Appellees*

99.  Lee, Jin Hee, *Counsel for Plaintiffs-Appellees*

100.  Leftheris, Julie, *Defendant*

101.  Lemasters, Lauren D., *Defendant*

102.  Levine, Alan, *Defendant*

103.  Lopez, Daniella, *Defendant*

104.  Lowell, Natasha, *Defendant*

105.  Lubin, Catharine, *Counsel for Plaintiffs-Appellees*

106. Lugo, Cristhofer, *Defendant*

107. Lydecker, Charles, *Defendant*

108. Mabatah, Isiuwa Jacqueline, *Counsel for Plaintiffs-Appellees*

109. Maggard, Randall Scott, *Movant-Appellant*

110. Maida, Michael, *Counsel for Movants-Appellants*

111. Marshall, Steve, *Counsel for Amicus Curiae the State of Alabama*

112. Martins, Alex, *Defendant*

113. Massullo, Ralph, *Movant-Appellant*

114. Mateer, Craig, *Defendant*

115. McAlpin, Caryl, *Defendant*

116. McClain, Stan, *Movant-Appellant*

117. McLaurin, Charles, *Counsel for Plaintiffs-Appellees*

118. McNamara, Caroline A., *Counsel for Plaintiffs-Appellees*

119. Michael, Deanna, *Defendant*

120. Miklos, John, *Defendant*

121. Mills, Harold, *Defendant*

122. Miyares, Jason S., *Counsel for Amicus Curiae the State of Virginia*

123. Monbarren, Lauran, *Defendant*

124. Moore, Kimberly, *Defendant*

125. Moraff, Laura Beth, *Counsel for Plaintiffs-Appellees*

126. Morris, Joshua, *Counsel for Plaintiffs-Appellees* in in *Novoa v. Diaz*, No. 22-13994

127. NAACP Legal Defense & Educational Fund, *Counsel for Plaintiffs-Appellees*

128. Nascimento, Isabella Salomao, *Counsel for Plaintiffs-Appellees*

129. Novoa, Adriana, *Plaintiff-Appellee* in in *Novoa v. Diaz*, No. 22-13994

130. Oberdorf, Tobin Rogers, *Movant-Appellant*

131. Occhipinti, Anna, *Counsel for Plaintiffs-Appellees*

132. Ohlendorf, John David, *Counsel for Defendants*

133. Okaty, Michael, *Defendant*

134. O'Keefe, Daniel T., *Defendant*

135. Palyam, Nithin, *Defendant*

136. Pardue, Crystal, *Counsel for Plaintiffs-Appellees*

137. Park, Shelley, *Plaintiff-Appellee*

138. Parsons, Emily, *Counsel for Plaintiffs-Appellees*

139. Patel, Rahul, *Defendant*

140. Patel, Shilen, *Defendant*

141. Paxton, Warren Kenneth, *Counsel for Amicus Curiae the State of Texas*

142. Payne, Bobby, *Movant-Appellant*

143. Pernell, LeRoy, *Plaintiff-Appellee*

144. Perry, Belvin, Jr., *Defendant*

145. Pettit, Lanora C., *Counsel for Amicus Curiae the State of Texas*

146. Phalin, Amanda J., *Defendant*

147. Piccolo, Fredrick, *Defendant*

148. Powers, Marsha D., *Defendant*

149. Prescott, T. Gene, *Defendant*

150. Rakita, Theodore E., *Counsel for Amicus Curiae the State of Indiana*

151. Ramer, John, *Counsel for Defendants*

152. Rechek, Samuel, *Plaintiff-Appellee* in in *Novoa v. Diaz*, No. 22-13994

153. Reed, Craig, *Defendant*

154. Reyes, Sean D., *Counsel for Amicus Curiae the State of Utah*

155. Ridley, Fred S., *Defendant*

156. Roth, Justin, *Defendant*

157. Roth, Rick, *Movant-Appellant*

158. Rowe, Chanel T., *Defendant*

159. Sandoval, Jennifer, *Plaintiff-Appellee*

160. Sargeant, Deborah, *Defendant*

161. Sarnoff, Marc D., *Defendant*

162. Sasser, Bob, *Defendant*

163. Schneider, Jenifer, *Defendant*

164.  Scott, Steven, *Defendant*

165.  Seay, Beverly J., *Defendant*

166.  Seixas, Melissa, *Defendant*

167.  Self, William, *Defendant (Dismissed on Nov. 17, 2022)*

168.  Shoaf, Jason, *Movant-Appellant*

169.  Silagy, Eric, *Defendant*

170.  Sirois, Tyler, *Movant-Appellant*

171.  Steinbaugh, Adam, *Counsel for Plaintiffs-Appellees* in in *Novoa v. Diaz*, No. 22-13994

172.  Stermon, Kent, *Defendant*

173.  Stone, II, Judd E., *Counsel for Amicus Curiae the State of Texas*

174.  Stone, Kenward, *Defendant*

175.  Sykes, Emerson James, *Counsel for Plaintiffs-Appellees*

176.  Thiel, John, *Defendant*

177.  Tilley, Daniel Boaz, *Counsel for Plaintiffs-Appellees*

178.  Tobin, Charles David, *Counsel for Plaintiffs-Appellees*

179.  Tovar, Rogelio, *Defendant*

180.  Truenow, Keith, *Movant-Appellant*

181.  Trujillo, Carlos, *Defendant*

182.  University of Central Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

183.  University of Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

184.  University of South Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

185.  Walker, Judge Mark E., U.S. District Court for the Northern District of Florida

186.  Washington, Nicole, *Defendant*

187.  Watson, Leah Monique, *Counsel for Plaintiffs-Appellees*

188.  Weatherford, Drew, *Defendant*

189.  Weatherford, William, *Defendant*

190.  Webster, Brent, *Counsel for Amicus Curiae the State of Texas*

191.  Whitaker, Henry, *Counsel for Movants-Appellants*

192.  Wilson, Alan, *Counsel for Amicus Curiae the State of South Carolina*

193.  Wold, Megan M., *Counsel for Defendants*

194.  Zucker, Anita G., *Defendant*

Plaintiffs-Appellees further state that no publicly traded company or corporation has an interest in the outcome of the case or appeal.

## <u>STATEMENT PURSUANT TO ELEVENTH CIRCUIT RULE 35-5(c)</u>

I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to the following decisions of the Supreme Court of the United States or the precedents of this circuit and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court: *United States v. Gillock*, 445 U.S. 360, 373 (1980); *Trammel v. United States*, 445 U.S. 40, 47 (1980); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268, 270 & n.20 (1977); *In re Hubbard*, 803 F.3d 1298, 1311–14 (11th Cir. 2015).

I express a belief, based on a reasoned and studied professional judgment, that this appeal involves one or more questions of exceptional importance: This case endeavors to ensure that plaintiffs seeking to redress violations of their constitutional rights will not be categorically prohibited from obtaining legislative discovery in all 42 U.S.C. § 1983 cases.

/s/ Jerry C. Edwards
Jerry C. Edwards

*Counsel of Record for Plaintiffs-Appellees*
*LeRoy Pernell et al.*

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

CERTIFICATE OF INTERESTED PERSONS AND  CORPORATE DISCLOSURE STATEMENT ........................................................ C-1

STATEMENT PURSUANT TO ELEVENTH CIRCUIT RULE 35-5(c)............... i

TABLE OF CONTENTS......................................................................... ii

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF THE ISSUES.............................................................. 1

STATEMENT OF THE COURSE OF PROCEEDINGS ..................................... 1

ARGUMENT ..................................................................................... 3

I.   The Majority's Interpretation of State Legislative Privilege Finds No Support in Federal Rule of Evidence 501 or Federal Common Law ................ 4

II.  Supreme Court Precedent Makes Clear State Legislative Privilege Can Yield to Important Federal Interests in Section 1983 Cases ............................. 9

   A.  Section 1983 Furthers Important Federal Interests that Cannot Be Vindicated in Other Arenas or Through Other Means ............................ 12

   B.  Racial Equity Is an Important Federal Interest that May Require Inquiry into Legislative Intent.................................................. 14

CONCLUSION .................................................................................. 17

CERTIFICATE OF COMPLIANCE .......................................................... 19

CERTIFICATE OF SERVICE ................................................................. 19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*American Trucking Associations, Inc. v. Alviti,*
    14 F.4th 76 (1st Cir. 2021).................................................................11

*Benisek v. Lamone,*
    241 F. Supp. 3d 566 (D. Md. 2017)..................................................12

*Bethune-Hill v. Virginia State Board of Elections,*
    114 F. Supp. 3d 323 (E.D. Va. 2015) ...............................................12

*Brown & Williamson Tobacco Corp. v. Williams,*
    62 F.3d 408 (1995)...............................................................................7

*Canaan Christian Church v. Montgomery County, Md.,*
    335 F. Supp. 3d 758 (D. Md. 2018)..................................................14

*Carrollton Branch of NAACP v. Stallings,*
    829 F.2d 1547 (11th Cir. 1987) ........................................................15

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993)..........................................................................13

*In re Dinnan,*
    661 F.2d 426 (5th Cir. 1981) ............................................................10

*Dowdell v. City of Apopka, Fla.,*
    698 F.2d 1181 (11th Cir. 1983) ........................................................13

*Favors v. Cuomo,*
    285 F.R.D. 187 (E.D.N.Y. 2012)......................................................12

*Fox v. Vice,*
    563 U.S. 826 (2011)..........................................................................13

*In re Hubbard,*
    803 F.3d 1298 (11th Cir. 2015) ............................................3, 10, 11

*Matter of International Horizons, Inc.,*
    689 F.2d 996 (11th Cir. 1982) ..........................................................10

*Jaffee v. Redmond*,
    518 U.S. 1 (1996) ................................................................................. 5

*La Union Del Pueblo Entero v. Abbott*,
    68 F.4th 228 (5th Cir. 2023) ............................................................. 11

*League of Women Voters of Fla., Inc. v. Fla. Secretary of State*,
    66 F.4th 905 (11th Cir. 2023) ........................................................... 15

*Lee v. City of Los Angeles*,
    908 F.3d 1175 (9th Cir. 2018) ........................................................... 11

*Mitchum v. Foster*,
    407 U.S. 225 (1972) .......................................................................... 13

*Monroe v. Pape*,
    365 U.S. 167 (1961) .................................................................... 12, 13

*In re N.D. Legislative Assembly*,
    70 F.4th 460 (8th Cir. 2023) ............................................................. 11

*Nashville Student Organizing Committee v. Hargett*,
    123 F. Supp. 3d 967 (M.D. Tenn. 2015) ........................................... 12

*Rodriguez v. Pataki*,
    280 F. Supp. 2d 89 (S.D.N.Y. 2003) ................................................ 14

*S.C. State Conference of NAACP v. McMaster*,
    584 F. Supp. 3d 152 (D.S.C. 2022) ........................................ 11, 13, 14

*Smith v. Town of Clarkton, N.C.*,
    682 F.2d 1055 (4th Cir. 1982) ........................................................... 16

*Tenney v. Brandhove*,
    341 U.S. 367 (1951) ............................................................................ 7

*Trammel v. United States*,
    445 U.S. 40 (1980) ...................................................................... 5, 6, 8

*Underwood v. Hunter*,
    730 F.2d 614 (11th Cir. 1984) ........................................................... 15

*United States v. Gillock*,
  445 U.S. 360 (1980)......................................................................*passim*

*United States v. Singleton*,
  260 F.3d 1295 (11th Cir. 2001) .............................................................8

*Upjohn Co. v. United States*,
  449 U.S. 383 (1981)...............................................................................8

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
  429 U.S. 252 (1977)...............................................................14, 15, 16

*Whitford v. Gill*,
  331 F.R.D. 375 (W.D. Wis. 2019).......................................................11

**Statutes**

42 U.S.C. § 1983 ...........................................................................*passim*

**Other Authorities**

Federal Rule of Evidence 501 .........................................................*passim*

U.S. Const. art. I, § 6, cl. 1.......................................................................7

## STATEMENT OF THE ISSUES

I.     Whether the Majority contravened Supreme Court precedent by holding that the qualified state legislative privilege is absolute in 42 U.S.C. § 1983 cases.

## STATEMENT OF THE COURSE OF PROCEEDINGS

This case concerns Plaintiffs' lawsuit under 42 U.S.C. § 1983 challenging the Stop W.O.K.E. Act as violative of the First and Fourteenth Amendments to the U.S. Constitution. App. 54, 72. Plaintiffs allege that the Act violates the Fourteenth Amendment's Equal Protection Clause because it "was enacted for a racially discriminatory purpose" and would cause a racially disparate impact. App. 59, 134–41, 382. Plaintiffs further allege that members of the Florida Legislature knew the Act would have a "disparate impact" on Black students and instructors. App. 484–85, 490–91. In discovery, Plaintiffs served subpoenas on 14 nonparty members of the Florida Legislature seeking communications between legislators, their staff, and others concerning the Act. App. 456–72, 483 & n.1.

The legislators moved to quash the subpoenas under Federal Rule of Civil Procedure 45(d)(3), citing undue burden and legislative privilege. App. 440. The district court granted the motion in part, denying Plaintiffs "the overwhelming majority of the documents" they requested, cutting the subpoena's time frame in half, and eliminating proposed search terms related to gender. App. 540–541. The district court found that legislative privilege shielded documents "contain[ing]

opinions, recommendations or advice." App. 535. The court thus issued only a narrow order, requiring legislators to produce nothing other than "documents containing factually based information used in the decision-making process or disseminated to legislators or committees, such as committee reports and minutes of meetings." App. 526–29.

The district court based this decision on two independent grounds. First, the court concluded that the narrow set of factual documents fell outside the scope of legislative privilege. App. 528. Second, the district court followed Supreme Court precedent dictating that legislative privilege yields to "important federal interests." App. 529–35. Applying a balancing test that has been used by courts across the country, the district court concluded that while documents containing opinions, recommendations, or advice are not discoverable, the factual documents sought here are. App 528, 541. The legislators appealed the district court's discovery order. App. 545, 549–556. The district court stayed its order pending appeal. App. 562-65.

On October 30, 2023, over a dissent, the Majority held that the district court abused its discretion in finding that factually based documents are discoverable in this case and concluded that legislative privilege never yields in § 1983 cases.

## ARGUMENT

In contravention of *United States v. Gillock*, 445 U.S. 360, 373 (1980), and the other Supreme Court precedents governing privileges under Federal Rule of Evidence 501, the Majority established an absolute rule that state legislative privilege never yields in § 1983 cases no matter the importance of the federal interests presented, the need for legislative discovery, or the level of the intrusion, or lack thereof, into the legislative process. The Majority's categorical rule ignores the Supreme Court's directive to weigh the important competing interests when assessing claims of privilege. Moreover, it is at odds with the reasoning of this Court's decision in *In re Hubbard*, 803 F.3d 1298, 1311–14 (11th Cir. 2015), which recognized the need for a more balanced approach when legislative intent is at issue. This "outlier position" ignores the decades-long recognition, in courts across the country, that production of legislative discovery in § 1983 cases is appropriate, subject to a balancing test, and can be accomplished without impeding the exercise of legislative functions. Dissenting Op. 2, 22 & n.13. *En banc* review is vital so the entire Court can determine if such an absolute rule should be imposed upon all lawsuits brought under § 1983, which serves as the primary vehicle for citizens to vindicate all constitutional rights.

The Majority's failures to ground its analysis in Federal Rule of Evidence 501 and federal common law, to faithfully apply *Gillock*'s rule that state legislative

privilege yields to sufficiently weighty federal interests, and to meaningfully consider the importance of federal interests presented by § 1983 cases warrant *en banc* review. The Majority's decision should be vacated and the decision below affirmed. But, even if this Court were to conclude that the district court erred in permitting discovery under the facts of this case, *en banc* review is still essential to address the Majority's new, blanket rule that legislative privilege never yields in § 1983 cases.

I.    **The Majority's Interpretation of State Legislative Privilege Finds No Support in Federal Rule of Evidence 501 or Federal Common Law.**

Claims of privilege are controlled by Federal Rule of Evidence 501, which holds that "[t]he common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege unless any of the following provides otherwise: the United States Constitution, a federal statute, or rules prescribed by the Supreme Court." In concluding that state legislative privilege is absolute in § 1983 cases, the Majority did not ground its analysis in Rule 501 or the federal common law governing privileges. *See* Op. 9–12. Indeed, it did not mention Rule 501 once in its opinion. Instead, it relied principally on a case analyzing state legislators' immunity from suit—a case that did not address the scope of the common law evidentiary privilege. *Id.*

Rule 501 instructs the federal courts to interpret privileges using common law principles "in the light of reason and experience." *Jaffee v. Redmond*, 518 U.S. 1, 8 (1996) (quoting Fed. R. Evid. 501). In enacting Rule 501, Congress did not adopt any rule of absolute privilege, instead it "provide[d] the courts with the flexibility to develop rules of privilege on a case-by-case basis." *Trammel v. United States*, 445 U.S. 40, 47 (1980) (citation omitted). In choosing this flexible, case-specific approach, Congress entrusted the courts with the responsibility of balancing the important interests protected by the privilege against the important interests advanced by "utilizing all rational means for ascertaining truth." *Id.* at 50 (citation omitted).

In applying this analysis to state legislative privilege, the Supreme Court has observed that the privilege is not "indelibly ensconced in our common law or an imperative of federalism." *Gillock*, 445 U.S. at 367–68. It based this conclusion on its decision not to recommend Congress recognize a state legislative privilege at the time Rule 501 was being considered, despite the fact that it and the Judicial Conference of the United States recommended Congress protect nine other specific privileges. *Id.* at 367; *see also* Dissenting Op. 12–13 & n.5.

Nor did the Supreme Court see any constitutional considerations as compelling recognition of an unqualified state legislative privilege. Unlike Congress's absolute privilege arising out of the U.S. Constitution's Speech or

Debate Clause, state legislative privilege does not implicate separation of powers concerns because "the Supremacy Clause dictates that federal enactments will prevail over competing state exercises of power." *Gillock*, 445 U.S. at 370 ("[F]ederal interference in the state legislative process is not on the same constitutional footing with the interference of one branch of the Federal Government in the affairs of a coequal branch."). Accordingly, it is a more limited privilege. *See id.* at 369 (noting that a privilege rooted in "judge-made rules of evidence" is "far less" protective "than the legislative privilege created by the Federal Constitution").

Certainly, comity—the federal courts' "sensitivity to interference with the functioning of state legislators," *id.* at 372—can support recognition of state legislative privilege under federal common law. *See id.* at 373. Comity and federalism undoubtedly are important interests and "command careful consideration." *Id.* But so too are the federal interests presented in § 1983 cases and "the need for probative evidence." *Trammel*, 445 U.S. at 51; *see also* Dissenting Op. 13–17. This is why Congress, through Rule 501, asked courts to balance these considerations and make case-specific decisions.

Yet, the Majority did not undertake this analysis in announcing its rigid, categorical rule: that no matter the stakes of the case, no matter the importance of the rights involved, and no matter the minuteness of the intrusion in the legislative

process, state legislators have an absolute evidentiary privilege in § 1983 cases. *See* Op. 10. The Majority erred in its interpretation of Supreme Court precedent.

First, the Majority suggested that *Gillock*—which found that legislative privilege must yield in the context of a federal criminal investigation, 445 U.S. at 373—could not be read to support limiting the privilege in the civil context. Op. 10. But as the Majority itself acknowledged, *Gillock* explicitly "left open the possibility of further extension" of the exceptions to legislative privilege. Op. 11.

Second, the Majority cited *Tenney v. Brandhove*, a case that dealt solely with state legislators' immunity from suit, to conclude that legislative privilege does not yield when the claim depends on legislative intent. *See* 341 U.S. 367, 379 (1951); Op. 12. Whether state legislators are immune from suit, however, is, importantly, separate and apart from whether they are absolutely immune from providing discovery. Op. 10–11.

Third, the Majority relied on *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 421 (1995), a case that analyzed the U.S. Constitution's Speech or Debate Clause and stands only for the unremarkable proposition that Congress's testimonial privilege and immunity from suit are equal in vigor because both arise from the same textual source in the Constitution, that members of Congress "shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. But state legislators' Rule 501 evidentiary privilege and their immunity from suit recognized

in *Tenney* do not share a similar anchor. Yet, the Majority glossed over this distinction and made no effort to explain why the evidentiary privilege and immunity from suit should be coterminous in this context.

Moreover, the Majority did not describe how "reason and experience" demonstrate that state legislators should have an absolute evidentiary privilege in § 1983 cases. Fed. R. Evid. 501. Nor did it show how its sweeping interpretation could comply with the Supreme Court's instruction to "strictly construe[]" the privileges rooted in Rule 501. *Trammel*, 445 U.S. at 50; *see also United States v. Singleton*, 260 F.3d 1295, 1300 (11th Cir. 2001) ("[P]rivileges must be narrowly construed because they impede the search for truth."). And the Majority did not explain why it was necessary to "violate the spirit of Federal Rule of Evidence 501" by reaching beyond the facts of this case to issue a categorical rule in all § 1983 cases. *Upjohn Co. v. United States*, 449 U.S. 383, 396–97 (1981) (noting that resolving privileges on a case-by-case basis "obeys the spirit of [Rule 501]").

Simply put, the Majority does not reconcile its categorical approach to state legislative privilege with the Supreme Court precedents governing Rule 501 privileges and federal common law, particularly the precedents instructing that privileges should be strictly construed. *En banc* review is necessary to resolve this conflict.

**II.     Supreme Court Precedent Makes Clear State Legislative Privilege Can Yield to Important Federal Interests in Section 1983 Cases.**

The Majority's ruling that state legislative privilege is unqualified in § 1983 cases, no matter the importance of the federal interests presented, conflicts with the Supreme Court's decision in *United States v. Gillock*. In *Gillock*, the Court held that "although principles of comity command careful consideration, our cases disclose that where important federal interests are at stake, as in the enforcement of federal criminal statutes, comity yields." 445 U.S. at 373. In other words, comity—the interest that supports the recognition of state legislative privilege under Rule 501—can give way to sufficiently important federal interests. The Supreme Court recognized enforcement of federal criminal law as one such example, but it did not say that was the only scenario where weighty federal interests could overcome comity.

Indeed, the Majority admitted as much in its opinion. *See* Op. 11. Yet, it still imposed an absolute rule that no matter how significant the federal interests in a § 1983 case are or how minimal the intrusion into the state legislative process is, state legislators' interests in comity can never be overcome. *See* Op. 10. This conflicts with *Gillock*'s holding and analysis. *See* 445 U.S. at 373 (observing that the privilege yielding "may have some minimal impact on the exercise of [the lawmaker's] legislative function," but recognizing that the importance of the federal interests at stake outweighed that impact). The Majority's suggestion that state

legislative privilege is absolute in § 1983 cases because the Supreme Court has not expressly extended the holding of *Gillock* has no grounding in the case itself and flips the ordinary presumption against the extension of evidentiary privileges on its head. *See In re Dinnan*, 661 F.2d 426, 428–29 (5th Cir. 1981) (reaffirming the presumption against the extension of privileges).[1]

It also runs afoul of this Court's *Hubbard* opinion. *Hubbard* acknowledged that "a state lawmaker's legislative privilege must yield in some circumstances where necessary to vindicate important federal interests such as 'the enforcement of federal criminal statutes.'" *In re Hubbard*, 803 F.3d at 1311 (quoting *Gillock*, 445 U.S. at 373). It further recognized that enforcing the First Amendment was "[o]bviously" an important federal interest. *Id.* at 1312. But the plaintiffs there, unlike Plaintiffs here, did not assert a cognizable claim that justified inquiry into legislative motive. *See id.* at 1314 (stating that, because plaintiffs' retaliation claim was "foreclose[d]," "there [was] no strong federal interest that outweigh[ed] the interests behind the legislative privilege."). *Hubbard* confirms that when, as here, a plaintiff raises a valid § 1983 claim that requires inquiry into legislative intent, a court must balance the importance of vindicating federal rights against the need to

---

[1] *In re Dinnan* is binding precedent in the Eleventh Circuit. *Matter of Int'l Horizons, Inc.*, 689 F.2d 996, 1004 n.17 (11th Cir. 1982).

avoid *undue* intrusion into the legislative process in determining whether to permit discovery. *See id.* at 1312–15.

Moreover, the Majority's absolute rule is out of step with the weight of circuit precedent. The First, Fifth, Eighth, and Ninth Circuits have considered this issue, and all have acknowledged that there may be civil cases where the privilege can be overcome. *See In re N.D. Legis. Assembly*, 70 F.4th 460, 465 (8th Cir. 2023) (an "exception to legislative privilege … might be available in a case that is based on a legislature's alleged intent"); *La Union Del Pueblo Entero v. Abbott*, 68 F.4th 228, 238 (5th Cir. 2023) (acknowledging that state legislative privilege "is qualified" and might be overcome in "extraordinary civil cases" (citations omitted)); *Am. Trucking Ass'ns, Inc. v. Alviti*, 14 F.4th 76, 88 (1st Cir. 2021) (noting that "there might be a private civil case in which state legislative immunity must be set to one side because the case turns so heavily on subjective motive or purpose"); *Lee v. City of Los Angeles*, 908 F.3d 1175, 1187–88 (9th Cir. 2018) (analyzing the factual record to address whether legislative privilege should yield under the circumstances of that case). Additionally, district courts across the country have held that the privilege is qualified in § 1983 cases and can give way to sufficiently important federal interests. *See, e.g.*, *S.C. State Conf. of NAACP v. McMaster*, 584 F. Supp. 3d 152, 161–62 (D.S.C. 2022); *Whitford v. Gill*, 331 F.R.D. 375, 378–79 (W.D. Wis. 2019) (Ripple, Circuit J.), *order vacated as moot Whitford v. Vos*, No. 19-2066, 2019 WL 4571109

(7th Cir. July 11, 2019); *Benisek v. Lamone*, 241 F. Supp. 3d 566, 574 n.8 (D. Md. 2017) (Niemeyer, Circuit J.); *Bethune-Hill v. Va. State Bd. of Elections*, 114 F. Supp. 3d 323, 334–36 (E.D. Va. 2015); *Nashville Student Org. Comm. v. Hargett*, 123 F. Supp. 3d 967, 969 (M.D. Tenn. 2015); *Favors v. Cuomo*, 285 F.R.D. 187, 213–14 (E.D.N.Y. 2012).

The Majority's categorical rule is out of step with decisions from federal courts across the country and conflicts with the Supreme Court's holding in *Gillock*—that state legislative privilege can yield to important federal interests.

## A. Section 1983 Furthers Important Federal Interests that Cannot Be Vindicated in Other Arenas or Through Other Means.

Section 1983 cases—the primary vehicle through which the American people remedy deprivations of their constitutional rights—undoubtedly can present important federal interests. And these federal interests may be weighty enough in some § 1983 cases to justify state legislative privilege yielding.

Congress passed § 1983, also known as the Ku Klux Klan Act, to enforce the provisions of the Fourteenth Amendment and combat "the lawless conditions existing in the South in 1871." *Monroe v. Pape*, 365 U.S. 167, 171, 174 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978). The law had "three main aims": (1) "override certain kinds of state laws," (2) "provide[] a remedy where state law was inadequate," and (3) "provide a federal remedy where the state remedy, though adequate in theory, was not available

in practice." *Id.* at 173–74. In other words, the purpose of § 1983 was to override state comity when it impeded the vindication of federal constitutional rights. *See Mitchum v. Foster*, 407 U.S. 225, 242 (1972).

Enforcement of § 1983 generally falls on private plaintiffs, not the federal government. That is why the Supreme Court has observed that "[w]hen a plaintiff succeeds in remedying a civil rights violation [under § 1983], … he serves as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority." *Fox v. Vice*, 563 U.S. 826, 833 (2011); *see also Dowdell v. City of Apopka, Fla.*, 698 F.2d 1181, 1189 n.12 (11th Cir. 1983) (discussing the benefits of employing litigants as "private attorneys general" to enforce civil rights laws). Accordingly, § 1983 lawsuits brought by private litigants can feature federal interests that are on par with those presented by federal criminal prosecutions. *See S.C. State Conf. of NAACP*, 584 F. Supp. 3d at 162. After all, § 1983 safeguards a panoply of our most important rights, including free speech, equal protection, religious freedom, the right to keep and bear arms, and the right to vote. *See* Dissenting Op. 15–16.

Indeed, one example of the potential impact of the Majority's sweeping holding is that it will severely limit plaintiffs' ability to prove religious discrimination claims. *See, e.g.*, *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993) (looking beyond the face of the law to legislative

motivation in seeking to evaluate whether the law discriminated against religion in violation of the Free Exercise Clause); *Canaan Christian Church v. Montgomery Cnty., Md.*, 335 F. Supp. 3d 758, 765–69 (D. Md. 2018) (applying *Gillock* to a religious discrimination case and balancing the parties' interests). The Majority's conclusion that § 1983 suits can never present weighty enough interests to overcome the comity undergirding state legislative privilege ignores the history and purpose of § 1983. *See* Dissenting Op. 13–14.

### B. Racial Equity Is an Important Federal Interest that May Require Inquiry into Legislative Intent.

In certain cases, third-party discovery of state legislators is appropriate and necessary to further the important federal interests underpinning Fourteenth Amendment racial discrimination claims. *See, e.g.*, *S.C. State Conf. of NAACP*, 584 F. Supp. 3d at 166; *Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 93 (S.D.N.Y. 2003). Indeed, despite the Majority's assertion that "[t]he Supreme Court has never expanded the *Gillock* exception beyond criminal cases," Op. 10, the Supreme Court in *Arlington Heights* anticipated that comity may sometimes yield in § 1983 cases. *Arlington Heights*, which involved private litigants utilizing § 1983 to bring an Equal Protection Claim, set forth "a sensitive inquiry into such circumstantial *and direct evidence of intent* as may be available" to determine whether state actors had a racially discriminatory purpose in creating a race-neutral law. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (emphasis added).

14

That inquiry includes "[t]he legislative … history" which "may be highly relevant, especially where there are contemporary statements by members of the decision-making body, minutes of its meetings, or reports." *Id.* at 268. Indeed, the Court noted that "[i]n some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony *frequently* will be barred by privilege." *Id.* (emphasis added).

In ruling on the facts of the case before it, the Supreme Court considered statements of local legislators as reflected in official minutes and the trial testimony of one legislator. *Id.* at 270 & n.20. It is thus unsurprising that federal courts, following *Arlington Heights*, often consider what legislators knew and communicated in the context of Equal Protection claims. *See, e.g.*, *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 931–32, 938–40 (11th Cir. 2023); *Carrollton Branch of NAACP v. Stallings*, 829 F.2d 1547, 1551–53 (11th Cir. 1987); *Underwood v. Hunter*, 730 F.2d 614, 618–20 (11th Cir. 1984), *aff'd*, 471 U.S. 222 (1985). It is noteworthy that the Supreme Court did not create an absolute rule that always prohibited legislative discovery in *Arlington Heights*. Rather, it acknowledged that the balance of the interests will usually shield legislators from having to testify. But the subpoenas at issue in this matter did not seek to put legislators on the stand. Rather, they sought a much less intrusive form of discovery—the production of documents. The district court then further limited the

subpoenas by granting Plaintiffs the right only to production of factual information after balancing the parties' interests, as the Supreme Court's and this Court's precedents instructed it to do.

It is inconceivable that the Supreme Court set forth a test in *Arlington Heights* wherein legislative motive is relevant to determining the constitutionality of a state action but litigants cannot—under any circumstances—access "direct evidence of intent" in discovery. 429 U.S. at 266; *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1064 (4th Cir. 1982) ("[Government officials] seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority."). Thus, the prevailing weight of precedent, including from the Supreme Court, supports the proposition that legislative privilege sometimes yields to the important federal interest of racial equity in § 1983 cases. To determine how to strike that balance in any specific case, a court must carefully consider the relevant factors on both sides of the analysis; it should not categorically eliminate that inquiry by holding that discovery is never available.

Here, the district court used a balancing test to weigh the relevant factors on both sides of the analysis. *See* App. 531. Courts across the country have employed this balancing test to analyze legislative privilege. *See* Dissenting Op. 22 n.13. "[R]eason and experience" suggest that it is well suited to this analysis. Fed. R. Evid. 501; *see also* Dissenting Op. 22–23. Plaintiffs urge the *en banc* Court to affirm the

district court or, in the alternative, correct the Majority's creation of a categorical rule that conflicts with precedent and return the case to the panel to consider the interests presented here under the proper balancing analysis.

## CONCLUSION

The Court should grant *en banc* review and affirm the district court.

Dated:  November 20, 2023

Respectfully submitted,

**AMERICAN CIVIL LIBERTIES FOUNDATION**

*/s/ Leah Watson*
Leah Watson
Emerson Sykes
Sarah Hinger
Crystal Pardue
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St., Fl. 18
New York, NY 10004
(212) 549-2500
lwatson@aclu.org
esykes@aclu.org
shinger@aclu.org
cpardue@aclu.org

**BALLARD SPAHR, LLP**

*/s/ Jason Leckerman*
Jason Leckerman
BALLARD SPAHR, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
(215) 864-8266
leckermanj@ballardspahr.com

**ACLU FOUNDATION OF FLORIDA**

*/s/ Jerry C. Edwards*
Jerry C. Edwards
ACLU FOUNDATION OF FLORIDA
933 Lee Road, Suite 102
Orlando, FL 32810
(786) 363-1107
jedwards@aclufl.org

Caroline McNamara
Jacqueline Azis
ACLU FOUNDATION OF FLORIDA
4343 W. Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2700
cmcnamara@aclufl.org
jazis@aclufl.org

**NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.**

*/s/ Morenike Fajana*
Morenike Fajana
Alexsis Johnson
Tiffani Burgess

Charles D. Tobin
Emily Parsons
BALLARD SPAHR, LLP
1909 K St., NW, 12th Fl.
Washington, D.C. 20006
(202) 661-2218
tobinc@ballardspahr.com
parsonse@ballardspahr.com

Jacqueline Mabatah
BALLARD SPAHR, LLP
201 S. Main St., Ste. 800
Salt Lake City, UT 84111-2221
(801) 531-3063
mabatahj@ballardspahr.com

NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, Fl. 5
New York, NY 10006
(212) 217-1690
mfajana@naacpldf.org
amjohnson@naacpldf.org
tburgess@naacpldf.org

Jin Hee Lee
Charles McLaurin
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street, Suite 600
Washington, D.C. 20005
(202) 682-1300
jlee@naacpldf.org
cmclaurin@naacpldf.org

*Counsel for Plaintiffs-Appellees*

## **CERTIFICATE OF COMPLIANCE**

On behalf of Plaintiffs-Appellees, I hereby certify pursuant to Federal Rule of Appellate Procedure 32(g)(1) that the attached brief is proportionally spaced, has a typeface of 14 points, and contains 3,885 words, excluding the parts of the brief exempted by Eleventh Circuit Rule 35-1.

Dated:  November 20, 2023                    */s/ Jerry C. Edwards*
                                             Jerry C. Edwards

## **CERTIFICATE OF SERVICE**

I, Jerry C. Edwards, counsel for Plaintiffs-Appellees and a member of the Bar of this Court, certify that on November 20, 2023, a copy of the foregoing was filed electronically through the appellate CM/ECF system with the Clerk of the Court. I further certify that all parties required to be served have been served.

                                             */s/ Jerry C. Edwards*
                                             Jerry C. Edwards

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

———————————————

No. 23-10616

———————————————

LEROY PERNELL,
DANA THOMPSON DORSEY,
SHARON WRIGHT AUSTIN,
SHELLEY PARK,
JENNIFER SANDOVAL, et al.,

Plaintiffs-Appellees,

*versus*

FLORIDA BOARD OF GOVERNORS OF THE STATE
UNIVERSITY,
et al.,

Defendants,

ROBERT ALEXANDER ANDRADE,
MELONY BELL,
DAVID BORRERO,
JUAN FERNANDEZ-BARQUIN,
RANDY FINE, et al.,

                              Interested Parties-Appellants.

————————————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:22-cv-00304-MW-MAF

————————————————

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR, Circuit Judge, and
COOGLER,[*] Chief District Judge.

WILLIAM PRYOR, Chief Judge:

This appeal poses the question whether a common-law privilege shields state legislators from a discovery request made for the purpose of determining the legislators' motives in passing a law. Professors and one student challenged Florida's Individual Freedom Act for having a racially discriminatory purpose in violation

————————————

[*] Honorable L. Scott Coogler, Chief United States District Judge for the Northern District of Alabama, sitting by designation.

of the Equal Protection Clause of the Fourteenth Amendment. After the plaintiffs subpoenaed legislators for documents related to the bill's drafting and adoption, the legislators moved to quash the subpoenas based on the legislative privilege. The district court partially denied the motion on the grounds that factual documents are outside the scope of the privilege and alternatively that important federal interests outweighed the legislative privilege. Because factual documents are within the scope of the privilege, which is unqualified in this kind of lawsuit, we reverse and remand with instructions to quash the subpoenas.

## I. BACKGROUND

In April 2022, Governor DeSantis signed into law the Individual Freedom Act, also called the Stop W.O.K.E. Act. *See* Ch. 2022-72, Laws of Fla. Governor DeSantis described the Act as "a stand against the state-sanctioned racism that is critical race theory." *Governor DeSantis Announces Legislative Proposal to Stop W.O.K.E. Activism and Critical Race Theory in Schools and Corporations*, News Release (Dec. 15, 2021), https://perma.cc/9VV7-7YCE. It prohibits Florida's public schools from "subject[ing] any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such [individual] to believe" any of eight concepts descended from critical race theory. FLA. STAT. § 1000.05(4)(a). For example, the Act stops schools from teaching that "[m]embers of one race, color, national origin, or sex are morally superior to members of another," that "[a] person, by virtue of his or her race, color, national origin, or sex, is inherently

racist, sexist, or oppressive, whether consciously or uncon-
sciously," or that "[a] person, by virtue of his or her race, color,
national origin, or sex, should be discriminated against or receive
adverse treatment to achieve diversity, equity, or inclusion." *Id.* §
1000.05(4)(a)(1), (2), (6).

   In August, seven professors and one student from public uni-
versities in Florida challenged the law in the district court as viola-
tive of their civil rights. *See* 42 U.S.C. § 1983. They described the
Act as "racially motivated censorship that the Florida legislature
enacted, in significant part, to stifle widespread demands to discuss,
study, and address systemic inequalities, following the nationwide
protests that provoked discussions about race and racism in the af-
termath of the murder of George Floyd." They alleged that the Act
imposes viewpoint restrictions in violation of the First Amend-
ment, is unconstitutionally vague in violation of the Due Process
Clause of the Fourteenth Amendment and was enacted with a ra-
cially discriminatory purpose in violation of the Equal Protection
Clause. The district court preliminarily enjoined the Act's enforce-
ment in higher education on the viewpoint discrimination and
vagueness grounds. That injunction is the subject of another ap-
peal. The plaintiffs did not seek preliminary injunctive relief for the
claim that the Act violated the Equal Protection Clause.

   The plaintiffs served subpoenas on fourteen non-party legis-
lators—thirteen co-sponsors of the Act and one legislator who sup-
ported the bill during a Florida House of Representatives debate.
The subpoenas sought an array of documents from "both personal

and government devices" from January 2020 onward that bore on eighteen separate requests. For example, the subpoenas demanded the production of "[a]ny and all notes, memoranda, research, written analysis, white papers, studies, reports, or opinions relied upon, created by, or reviewed by [the legislator] or [the legislator's] employees, staff, or representatives," regarding "creation and drafting," the "enactment," and the "implementation" of the Act. The subpoenas also sought "[a]ll [d]ocuments or [c]ommunications assessing or predicting the potential impacts of [the Act], or other related bills, including, but not limited to, impact on [b]lack persons, including students or educators, in Florida." And the requested discovery extended beyond documents concerning the bill itself to "all documents reflecting communications . . . regarding Racial Justice Protests or Black Lives Matter" or "Critical Race Theory." After the parties conferred to discuss the subpoenas, the plaintiffs proposed a list of over seventy search terms for use in complying with the subpoenas—e.g., antifa, Woke-at-work, Colonizer, 1619, Sexis[t], Feminis[t], and Tucker Carlson. In response, the legislators argued that "the legislative privilege prohibits these sort of fishing expeditions" and moved to quash the subpoenas.

The district court partially granted and partially denied the legislators' motion. Because it determined that "most of the documents . . . are subject to legislative privilege," it granted the motion to quash as to the bulk of the requested discovery. It also narrowed the list of search terms to exclude those related to gender and shortened the timeframe to extend from March 2021 through the passage of the Act.

The district court required the production of "documents containing factually based information used in the decision-making process or disseminated to legislators or committees" for two reasons. First, it reasoned that the legislative privilege does not extend to "purely factual documents, including bill drafts, bill analyses, white papers, studies, and news reports." Second, the district court reasoned that, even if the legislative privilege does extend to purely factual documents, it yields to the important federal interests present here. The district court concluded that, on the one hand, the "legislative privilege's purpose" "weigh[ed] heavily in favor of non-disclosure." But it concluded that, on the other hand, the subpoenas sought evidence that was "highly relevant" to the plaintiffs' efforts to "vindicate public right[s] that impact thousands of faculty and students," and "in that respect, their equal protection claim [was] akin to criminal prosecutions," to which the legislative privilege can yield.

After the legislators appealed, the district court stayed the discovery order pending the resolution of this appeal. The appeal was expedited to oral argument on the parties' joint motion. Seventeen state attorneys general filed a brief as *amici curiae* supporting the legislators.

## II. STANDARD OF REVIEW

This Court reviews the denial of a motion to quash a subpoena for abuse of discretion. *See In re Hubbard*, 803 F.3d 1298, 1307 (11th Cir. 2015). "A ruling based on an error of law or one that reflects a clear error of judgment is an abuse of discretion." *Id.*

## III. DISCUSSION

We divide our discussion in two parts. We first address the erroneous determination that the legislative privilege does not protect "factual documents." We then address the erroneous determination that the legislative privilege should yield to the important federal interests in this case.

### A.  *The Legislative Privilege Shields Purely Factual Information.*

A common-law privilege protects state legislators from "deterrents to the uninhibited discharge of their legislative duty" for the purpose of "the public good." *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951). Although the core of the privilege is a state legislator's immunity from civil suit for acts related to legislative proceedings, *see id.* at 379, we have explained that this "privilege extends to discovery requests" because "complying with such requests detracts from the performance of official duties." *Hubbard*, 803 F.3d at 1310. So, where a discovery request "inquir[es] into legislative acts or the motivation for actual performance of legislative acts," state legislators can "protect the integrity of the legislative process" by invoking the privilege to quash the request. *Bryant v. Jones*, 575 F.3d 1281, 1304–05 (11th Cir. 2009) (quoting *United States v. Brewster*, 408 U.S. 501, 507, 509 (1972)).

The district court split the documents subject to subpoena into two categories: "purely factual documents" and those documents that "set[] out the [l]egislators' or their staff members' motivations and mental impressions." And it denied the legislators' mo-

tion as to the first category because, it determined, factual documents fall outside the privilege's scope. But the categorical distinction drawn by the district court between factual documents and other documents has no basis in our precedent.

Our precedent makes clear that we consider the *purpose* of a subpoena, not what the subpoena seeks, to determine if the legislative privilege applies. *See Hubbard*, 803 F.3d at 1311. In *Hubbard*, we explained that "[a]ny material, documents, or information that . . . go[es] to legislative motive [is] covered by the legislative privilege." *Id*. We held that the district court should have quashed subpoenas where their "only purpose was to support the lawsuit's inquiry into the motivation behind [a statute], an inquiry that strikes at the heart of the legislative privilege." *Id*. at 1310.

In *Hubbard*, we explained that where a claim is "at its core and in its entirety an inquiry into the subjective motivation" of the legislators, we do not take a "document-by-document" approach:

> [T]here was no need for the lawmakers to peruse the subpoenaed documents, to specifically designate and describe which documents were covered by the legislative privilege, or to explain why the privilege applied to those documents. It was enough to point out, as the lawmakers did, that the only purpose of the subpoenas was to further [the plaintiff's] inquiry into the lawmakers' motivations for [a statute] and that their legislative privileges exempted them from such inquiries.

*Id.* at 1311 (internal citation omitted). In other words, courts need not decide whether a document befits some descriptor, like "purely factual," to determine whether it is protected. If the document is sought for an impermissible purpose, the inquiry is over.

Our inquiry can end as quickly. According to the plaintiffs' response to the Florida legislators' motion to quash the subpoena, the plaintiffs served the subpoenas on the legislators to "determin[e] whether there was a discriminatory motive behind the [Act]." By the plaintiffs' own admission, the subpoenas' purpose was to uncover the legislators' motives in passing the law. "The privilege applies with full force against requests for information about the motives for legislative votes and legislative enactments." *Id.* at 1310. So, the privilege applies with its usual force against the discovery of even the factual documents in the Florida legislators' possession. The district court abused its discretion when it determined otherwise.

### B.   *The Legislative Privilege Is Unqualified Here.*

The district court concluded, in the alternative, that the purely factual documents were discoverable because any legislative privilege protecting them "[gave] way to important federal interests." To be sure, the legislative privilege may yield "where important federal interests are at stake, as in the enforcement of federal criminal statutes." *United States v. Gillock*, 445 U.S. 360, 373 (1980). But the district court decided that "the exception to [the] legislative privilege extends beyond the circumstances identified in *Gillock*" to include the facts of this case because the vindication of

a "public right that impact[s] thousands of faculty and students" is "at least as important as—if not more important" than—prosecuting criminals.

This extension was erroneous. The Supreme Court has never expanded the *Gillock* exception beyond criminal cases. "[F]or purposes of the legislative privilege, there is a fundamental difference between civil actions by private plaintiffs and criminal prosecutions by the federal government." *Hubbard*, 803 F.3d at 1311–12; *see Gillock*, 445 U.S. at 361, 372–73. Although the legislative privilege does not presumptively apply in the latter kind of case, the presumption otherwise holds firm. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977). And it is insurmountable in private civil actions under section 1983. Not only is a private action under section 1983 "not a federal criminal investigation," *Hubbard*, 803 F.3d at 1312, but the Supreme Court declared in *Gillock* that "a state legislator's common-law absolute immunity from civil suit survived the passage of the Civil Rights Act of 1871." *Gillock*, 445 U.S. at 372; *see also Tenney*, 341 U.S. at 376 ("We cannot believe that Congress—itself a staunch advocate of legislative freedom—would impinge on a tradition so well grounded in history and reason [as the legislative privilege] by covert inclusion [of an exception] in the general language [of section 1983] before us."); *see also Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 421 (D.C. Cir. 1995) ("We do not perceive a difference in the vigor with which the privilege protects against compelling a congressman's testimony as opposed to the protection it provides against suit.").

In the light of *Gillock* and *Tenney*, we cannot except civil-rights actions from the application of the legislative privilege.

To be sure, *Gillock* left open the possibility of further extension. *See* 445 U.S. at 373–74. But "the Supreme Court has not set forth the circumstances under which the privilege must yield to the need for a decision maker's testimony." *Lee v. City of Los Angeles*, 908 F.3d 1175, 1187 (9th Cir. 2018). And absent the Supreme Court's imprimatur, we are reluctant to adopt a manipulable balancing test, like the one employed by the district court, that links the derogation of the legislative privilege to a subjective judgment of the case's importance. Indeed, the test used by the district court is, as the state *amici* put it, "not persuasive on its own terms." As the states explain, most of its factors "simply mirror the general standard for discovery of non-privileged material."

None of our sister circuits have subjected the privilege to such a test, and at least four of them have rejected this approach. *See id.* at 1188 (holding that unsubstantiated "claims of racial gerrymandering," though "serious," "fall[] short of justifying the 'substantial intrusion' into the legislative process" of a discovery request (citation omitted)); *Am. Trucking Ass'ns, Inc. v. Alviti*, 14 F.4th 76, 88 (1st Cir. 2021) ("[This] argument suggests a broad exception overriding the important comity considerations that undergird the assertion of a legislative privilege by state lawmakers."); *La Union Del Pueblo Entero v. Abbott*, 68 F.4th 228, 239–40 (5th Cir. 2023) ("[A] state legislator's common-law absolute immunity from civil actions precludes the compelled discovery of documents pertaining

to the state legislative process that Plaintiffs seek here."); *In re North Dakota Legis. Assembly*, 70 F.4th 460, 465 (8th Cir. 2023) ("Dicta from *Village of Arlington Heights* does not support the use of a five-factor balancing test in lieu of the ordinary rule that inquiry into legislative conduct is strictly barred by the privilege."). We agree and join them.

Even if the privilege could be overcome by especially compelling civil-rights claims, we reject the plaintiffs' argument that the privilege must give way when the claim depends on proof of legislative intent. The Supreme Court has described legislative immunity as "indispensably necessary" as it "support[s] the rights of the people, by enabling their representatives to execute the functions of their office." *Tenney*, 341 U.S. at 373–74. "A court proceeding that probes legislators' subjective intent in the legislative process is a 'deterrent[] to the uninhibited discharge of their legislative duty.'" *Abbott*, 68 F.4th at 238 (quoting *Tenney*, 341 U.S. at 377). As our sister circuit has explained, we cannot create an "exception whenever a constitutional claim directly implicates the government's intent" because "that exception would render the privilege 'of little value.'" *Lee*, 908 F.3d at 1188 (quoting *Tenney*, 341 U.S. at 377); *Tenney*, 341 U.S. at 377 ("The claim of an unworthy purpose does not destroy the privilege."); *Abbott*, 68 F.4th at 238 ("This holds true even when constitutional rights are at stake.").

## IV. CONCLUSION

We **REVERSE** and **REMAND** with instructions to quash the subpoenas.

23-10616                JILL PRYOR, J., Dissenting                1

JILL PRYOR, Circuit Judge, dissenting:

This appeal concerns the scope and force of the legislative privilege—a federal common-law privilege that protects state legislators from discovery into legislative acts and the subjective motivations for those acts. We must determine whether the privilege prevents a group of plaintiffs from obtaining any discovery from Florida legislators to support the plaintiffs' claim that a recent Florida law intentionally harms racial minorities. I would hold that the privilege does not bar the plaintiffs' request.

After Florida's Legislature enacted a law curtailing discussions of race in Florida public schools, a group of professors and a student sued Florida officials alleging that the new law was racially motivated censorship and asking the district court to prevent its enforcement. The plaintiffs brought four counts against the officials, including one under the Equal Protection Clause of the Fourteenth Amendment. Because their equal protection claim required the plaintiffs to prove that the legislature was motivated in part by a desire to inflict racially disparate harm, the plaintiffs subpoenaed 14 legislators who sponsored or supported the Act, seeking documentary discovery. The legislators moved to quash the subpoenas, invoking the legislative privilege. The district court granted their motion for the most part. But it allowed the plaintiffs to subpoena the legislators for the factual materials and information available to the Legislature at the time it enacted the law. The court concluded that these factual materials fell outside the scope of the privilege,

and, in the alternative, the privilege yielded to the important federal interest in vindicating the Constitution's guarantee of equal protection.

The majority opinion reverses this limited denial of privilege. It holds that the plaintiffs were entitled to no discovery from the legislators because the legislative privilege is absolute in this context. In so holding, the majority opinion adopts the outlier position that the legislative privilege *never* yields in cases arising under 42 U.S.C. § 1983, the paradigm federal civil rights statute. I disagree because the Supreme Court has instructed that the legislative privilege held by state legislators is a qualified one: it may yield in the face of important federal interests. *United States v. Gillock*, 445 U.S. 360, 373 (1980). Certainly, § 1983 cases are capable of advancing important federal interests. And—as in equal protection cases like this one—§ 1983 cases may turn on the subjective motivations of legislators. I would not require plaintiffs put to such proof to litigate these important cases with one hand tied behind their backs.

I respectfully dissent.

## I.      BACKGROUND

In the winter of 2021, Florida's governor Ron DeSantis announced a legislative proposal that he dubbed the "Stop the Wrongs to Our Kids and Employees (W.O.K.E.) Act." News Release, *Governor DeSantis Announces Legislative Proposal to Stop W.O.K.E. Activism and Critical Race Theory in Schools and Corporations* (Dec. 15, 2021), https://perma.cc/U55E-VFUY. The governor her-

alded the proposed "Stop W.O.K.E. Act" as "the strongest legislation of its kind in the nation" and a tool to "take on . . . Critical Race Theory." *Id*. Describing critical race theory as "state-sanctioned racism," the governor promised not to "allow Florida tax dollars to be spent teaching kids to hate our country or to hate each other." *Id*. The lieutenant governor predicted that the proposed act would "put an end to wokeness" in Florida's schools and assure a "woke-free state of Florida." *Id*.

Heeding the governor's proposal, the Florida Legislature passed what it titled the "Individual Freedom Act." 2022 Fla. Sess. Law Serv. Ch. 2022-72 (C.S.H.B. 7) (West).[1] As relevant here, the Act amends Florida's Educational Equity Act to prohibit "training or instruction that espouses, promotes, advances, inculcates, or compels [a] student or employee to believe any . . . concept[]" specified by the Act. Fla. Stat. § 1000.05(4)(a). Many of the concepts or viewpoints the Act specifies bear on ongoing national debates regarding the role of race in American society and the appropriate response to centuries of racial discrimination. For instance, the Act prohibits instruction advancing the views that "[a] person, by virtue of his or her race, color, national origin, or sex, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion," *id*. § 1000.05(4)(a)(6); "[a] person's . . . status as either privileged or oppressed is necessarily determined by his or her race," *id*. § 1000.05(4)(a)(3); "[a] person, by virtue of

---

[1] The parties and the district court employ both names—the "Individual Freedom Act" and the "Stop W.O.K.E. Act." From here, I refer only to the "Act."

his or her race . . . bears personal responsibility for . . . actions[] in which the person played no part[] committed in the past by other members of the same race," *id.* § 1000.05(4)(a)(7); or that concepts including "merit, . . . neutrality, objectivity, and racial colorblindness are" themselves "racist[,]" *id.* § 1000.05(4)(a)(8) The Act does not prohibit instruction that espouses opposing points of view.

By its terms, the Act applies to Florida's "system of public K-20 education," *id.* § 1000.05(2)(a), which includes primary and secondary schools as well as post-secondary education—the Florida College System and Florida's state universities, *see id.* § 1000.04. The Act permits the state Board of Education to withhold funding from institutions that violate the Act, *id.* § 1000.05(7)(g), and allows anyone aggrieved by a violation to sue for equitable relief, attorney's fees, and costs, *id.* § 1000.05(9).

The plaintiffs in this case are seven professors and a student in Florida's public universities. The professors teach a variety of subjects: constitutional law, education law, politics, philosophy, communications, statistics, and psychology. Across the board, they explore race in their teaching and scholarship. For example, plaintiff LeRoy Pernell—a Professor of Law at Florida A&M University College of Law—teaches a course entitled, "The Role of Race in Criminal Procedure." Doc. 76 at 10.[2] Pernell's course examines the part race plays throughout the criminal process, including through the application of the Equal Protection Clause of the Fourteenth

---

[2] "Doc." refers to the district court's docket entries in this case.

Amendment, and asks students to consider ways in which the legal system is "color-conscious and promotes privilege based on race." *Id.* at 10–11; *see also*, *e.g.*, Reva Siegel, *Why Equal Protection No Longer Protects: The Evolving Forms of Status-Enforcing State Action*, 49 Stan. L. Rev. 1111 (1996) (considering the possibility that race-neutral approaches in antidiscrimination law "may be rationalizing practices that perpetuate historic forms of stratification"). The professors fear that the Act may outlaw their pedagogy.

After the governor signed the Act into law, the plaintiffs sued. In a four-count complaint, they alleged that the Act's lopsided treatment of certain views violates the First and Fourteenth Amendments. Pursuant to 42 U.S.C. § 1983, they sought declaratory and injunctive relief against Florida officials responsible for enforcing the Act.

Invoking three counts of their four-count complaint, the plaintiffs moved in the district court for a preliminary injunction. After a hearing, the district court entered a preliminary injunction barring certain defendant officials from enforcing the Act as the lawsuit progressed. In a separate appeal before this Court, the officials appealed the preliminary injunction. *See Pernell v. Comm'r of Fla. State Bd. of Educ.*, No. 22-13992 (11th Cir.).

The remaining count, Count IV, underlies this appeal. In Count IV, the plaintiffs alleged that the Act violates the Equal Protection Clause of the Fourteenth Amendment because the Act "was enacted for a racially discriminatory purpose" and would cause racially disparate harm. Doc. 76 at 95; *see Greater Birmingham*

*Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021) (to make out a claim that facially neutral state action violates the Equal Protection Clause, "[p]laintiffs must first show that the State's decision or act had a discriminatory purpose and effect" (internal quotation marks omitted)). According to the plaintiffs, the Act "targets the elimination of curriculum, instruction, and conversations designed to improve the educational, social, and civic experiences of Black people and other historically marginalized groups." Doc. 76 at 97. In support of Count IV, the plaintiffs alleged that members of the Florida Legislature knew that the Act "would have a disparate impact on Black students and instructors," *id.* at 85, in part because—as a result of testimony before the legislators— they knew it would "suppress[] speech and ideas that help Black people achieve equality," *id.* at 90.

To test the plaintiffs' allegations, the parties commenced discovery on Count IV. The plaintiffs served 14 nonparty members of the Florida legislature—13 legislators who co-sponsored the Act and one who "vocally supported" it—with subpoenas containing 18 requests for production of documents. Doc. 100 at 2. The requests spanned a three-year period and sought a broad set of documents and communications between the legislators, their staff, and others regarding the Act. For instance, the subpoenas requested that the legislators produce "[a]ny and all documents reflecting communications, including but not limited to, letters, e-mails, and text messages, exchanged between You or Your employees, staff, or representatives and Defendants or their employees, staff, or representative regarding [the Act] or Critical Race Theory." Doc. 91-1

at 13–14. They requested "notes, memoranda, research, written analysis, white papers, studies, report, or opinions" relied on by the legislators in considering the Act; documents and communications assessing the impact of the Act; and public remarks by the legislators concerning the Act. *Id.* at 16. They also sought communications between the legislators, the governor's office, and the University of Florida system on topics including the Act itself and concepts like "Critical Race Theory" and "Black Lives Matter." *Id.* In short, the subpoenas sought to probe the legislators' knowledge and motivations in supporting the Act.

The legislators moved to quash the subpoenas under Federal Rule of Civil Procedure 45(d)(3). They argued that the subpoenas would subject them to an undue burden, sought irrelevant information, and requested information protected by a common-law legislative privilege. In response, the district court quashed the subpoenas as to "the overwhelming majority of the documents Plaintiffs" requested. Doc. 100 at 19. To reduce the burden of the subpoenas, the district court halved the time frame covered by the plaintiffs' document requests. To ensure the relevance of requested documents, the district court eliminated proposed search terms that would bear on sex—not race—discrimination. And, to protect the integrity of the legislative process, the district court found that the legislative privilege prevented discovery of documents "contain[ing] opinions, recommendations or advice." *Id.* at 13 (internal quotation marks omitted). In the end, the court required the legislators to produce only "documents containing factually based information used in the decision-making process or disseminated to

legislators or committees, such as committee reports and minutes of meetings"—that is, "the materials and information available to the Legislature at the time a decision was made and nothing more." *Id*. (alteration adopted) (internal quotation marks omitted).

The district court rested its decision that the legislators were required to turn over "purely factual documents" on two alternative grounds. *Id*. at 6. First, it concluded that these documents fell outside the scope of the legislative privilege altogether. Second, it determined that even if the privilege reached purely factual documents, the privilege should yield as to those documents in this case. The district court reasoned that under United States Supreme Court precedent the legislative privilege gives way in the face of "important federal interests." *Id*. at 7 (internal quotation marks omitted). It then applied a five-part balancing test courts have used to evaluate of claims of executive privilege to assess whether this case presented such interests. Acknowledging the important purposes served by the legislative privilege, the district court determined to "strike some balance." *Id*. at 13. It concluded that by quashing the subpoenas as to documents of a deliberative character (those "contain[ing] opinions, recommendations or advice") but not factual documents, it could avoid "the most egregious intrusions into the legislative process" while also giving the plaintiffs evidence relevant to their equal protection claim. *Id*. (internal quotation marks omitted)

The legislators appealed the district court's discovery order.[3] The district court stayed its order pending this appeal, and on the parties' joint motion we expedited the appeal.

## II.    STANDARD OF REVIEW

"We review a trial court's ruling on a motion to quash a subpoena only for an abuse of discretion." *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1326 (11th Cir. 2020) (internal quotation marks omitted). And so "we will leave the district court's ruling on the motion undisturbed unless the district court has made a clear error of judgment, or has applied the wrong legal standard." *Id.* at 1326–27 (internal quotation marks omitted).

## III.    DISCUSSION

On appeal, the legislators argue that the district court should have quashed the subpoenas in their entirety. To prevail, they must persuade us that both alternative grounds for the district court's decision—that the legislative privilege does not reach the disputed documents and that it yields in this case—were abuses of discretion. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) ("To obtain reversal of a district court judgment that is based on multiple, independent grounds, an appellant must convince us that every stated ground for the judgment against him is

---

[3] The plaintiffs have not cross-appealed the district court's partial grant of the legislators' motion to quash.

incorrect."). I agree with the majority opinion that under our precedent the district court abused its discretion when it concluded that purely factual information does not implicate the legislative privilege.[4] From there, we part ways.

I would not hold—as the majority opinion does—that the legislative privilege, when it applies at all, is absolute in cases arising under 42 U.S.C. § 1983. Instead, I would affirm the district court's balancing approach because it is consistent with the Supreme Court's instruction that the legislative privilege yields in the

---

[4] Our precedent compels this conclusion. *See In re Hubbard*, 803 F.3d 1298 (11th Cir. 2015). In *Hubbard*, we were confronted with subpoenas whose sole purpose "was to probe the subjective motivations of the legislators who supported" a legislative act. *Id.* at 1310. Given this purpose, we explained, "[n]one of the information sought could have been outside the privilege" because the privilege guards against inquiries into "the subjective motivations of those acting in a legislative capacity." *Id.* at 1311. Here, the district court found (and the plaintiffs concede) that the purpose of the subpoenas was to "[p]ursu[e] evidence of discriminatory intent." Doc. 100 at 2; *see also* Br. of Appellees at 29 (pointing to "the subjective motivations of the [Act's] leading sponsors" as the object of the subpoenas (alteration adopted) (internal quotation marks omitted)). And the plaintiffs point to no other non-privileged purpose underlying the subpoenas that would require a "a document-by-document invocation of the legislative privilege." *Hubbard*, 803 F.3d at 1311.

Not only does *Hubbard* confirm that when the sole purpose of a subpoena is to probe legislative intent, the privilege applies to all the documents sought by the subpoena, but it is inconsistent with a factual document exception. The subpoenas in *Hubbard* sought the production of some of the very same types of documents the district court here deemed factual. *Compare id.* at 1303 n.4 (listing subpoena demands) *with* Doc. 100 at 6 (listing documents excepted as factual). We afforded no exception in that case.

face of "important federal interests." *Gillock*, 445 U.S. at 373. Section 1983 cases may both vindicate core federal interests (indeed, constitutional ones) and require courts to consider legislative motivation—precisely the inquiry the legislative privilege hampers.

## A.    The Legislative Privilege

Through the interplay of Federal Rule of Evidence 501 and Federal Rule of Civil Procedure 45(d)(3)(A)(iii), courts have recognized that state legislators hold a federal common-law privilege against compulsory discovery process. *In re Hubbard*, 803 F.3d 1298, 1307 (11th Cir. 2015); *accord La Union Del Pueblo Entero v. Abbott*, 68 F.4th 228, 235 (5th Cir. 2023). Rule 45 says that a court "must quash or modify a subpoena that . . . requires disclosure of privileged or other protected matter, if no exception" applies. Fed. R. Civ. P. 45(d)(3)(A)(iii). Rule 501, in turn, specifies that, in a federal question case, "[t]he common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege." Fed. R. Evid. 501.

The legislative privilege is "important" and "has deep roots in federal common law." *Hubbard*, 803 F.3d at 1307. It "'protects against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts.'" *Id*. at 1310 (emphasis omitted) (quoting *United States v. Brewster*, 408 U.S. 501, 525 (1972)). The privilege's purpose is to allow legislators to "focus on their public duties" by avoiding discovery procedures that might force them "to divert their time, energy, and attention," "detract[]

from the performance of official duties," or otherwise chill the legislative process. *Id.* (internal quotation marks omitted).

I pause here to distinguish the legislative privilege from the Constitution's Speech or Debate Clause, which provides that "for any speech or debate in either House," members of Congress "shall not be questioned in any other place." U.S. Const. art. I, § 6, cl. 1. Unlike the Speech or Debate Clause, the legislative privilege has no constitutional dimension. Nor, as the Supreme Court has explained, is the legislative privilege supported by the all the same rationales as the Speech or Debate Clause (or even its state constitutional analogues). Although the constitutional protection afforded to members of Congress is a "fundamental" part of our horizontal "system of checks and balances[,] . . . the separation of powers doctrine[] gives no support to the grant of a privilege to state legislators" in federal-question cases. *Gillock*, 445 U.S. at 369–70. And the Supreme Court has said that the history of Rule 501 "suggest[s] that the [legislative] privilege was not thought" by the drafters of the rule "to be either indelibly ensconced in our common law or an imperative of federalism." *Id.* at 367–68.[5] Instead,

---

[5] As the Court explained in *Gillock*, the Advisory Committee of the Judicial Conference of the United States initially "proposed" a "draft" of Rule 501 under which "federal courts would have been permitted to apply only nine specifically enumerated privileges, except as otherwise required by the Constitution or provided by Acts of Congress." *Gillock*, 445 U.S. at 367. A legislative privilege was not among those enumerated in the draft rule. "Neither the Advisory Committee, the Judicial Conference, nor this Court saw fit . . . to provide" a privilege to state legislators. *Id.* The *Gillock* Court doubted that the

the legislative privilege is grounded in our "sensitivity to interference with the functioning of state legislators"—comity. *Id*. at 372. And "although principles of comity command careful consideration, . . .where important federal interests are at stake, . . . comity yields." *Id*. at 373; *accord Hubbard*, 803 F.3d at 1311 ("[A] state lawmaker's legislative privilege must yield in some circumstances where necessary to vindicate important federal interests[.]").

### B.     The Privilege is Qualified in § 1983 Cases

In *Gillock*, the Court identified one important federal interest (the only one before it) to which comity yields: "the enforcement of federal criminal statutes." *Gillock*, 445 U.S. at 373. In this case, the legislators ask us, in essence, to read *Gillock* as if it considered and rejected all other possible important federal interests and conclude that in cases arising under 42 U.S.C. § 1983, the privilege never yields. Indeed, they decline to challenge the district court's ruling on any other ground.[6] The majority opinion indulges their extreme and novel request, holding that the legislative privilege "is insurmountable . . . under section 1983." Maj. Op. at 10. I cannot acquiesce. Like prosecutions enforcing federal criminal statutes, lawsuits under § 1983 may vindicate important federal interests.

---

legislative privilege could be both "an imperative of federalism" and entirely overlooked in the drafting of Rule 501. *Id*. at 367–68.

[6] On appeal, the legislators did not renew their burdensomeness or relevance challenges to the subpoena. And at oral argument counsel for the legislators agreed that they had not attacked the district court's application of the balancing test; rather they had argued only that the legislative privilege is absolute.

14                     J<small>ILL</small> Pryor, J., Dissenting                     23-10616

And sometimes that will require discovery "into acts that occur in the regular course of the legislative process and into the motivation for those acts." *Hubbard*, 803 F.3d at 1310 (emphasis omitted) (internal quotation marks omitted).

Section 1983—originally enacted as § 1 of the Ku Klux Klan Act of 1871, 17 Stat. 13—"created a species of federal tort liability for individuals to sue state and local officers for deprivations of constitutional rights." *Thompson v. Clark*, 596 U.S. 36, 42 (2022). Under the statute, plaintiffs may prevail by "show[ing] that they were deprived of a federal right by a person acting under color of state law." *Leake v. Drinkard*, 14 F. 4th 1242, 1247 (11th Cir. 2021) (internal quotation marks omitted). As a result, the statute allows private individuals to enforce federal constitutional rights against the states.

In 1871, Congress enacted § 1983, which it patterned after § 2 of the Civil Rights Act of 1866, against a backdrop of white supremacist lawlessness and racial terror throughout the South, to "'enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States.'" *Monroe v. Pape*, 365 U.S. 167, 171 (1961) (quoting 17 Stat. 13), *overruled in part on other grounds by Monell v. Dep't of Social Servs. of City of N.Y.*, 436 U.S. 658. 663 (1978). The Supreme Court has exhaustively reviewed the "lawless conditions existing in the South" underlying § 1983's passage: "whippings and lynchings and banishment ha[d] been visited upon unoffending American citizens . . . [m]en were murdered, houses were burned, . . . and officers of the law shot down; and the State made

no successful effort to bring the guilty to punishment or afford protection or redress to the outraged and innocent." *Id.* at 174–75 (internal quotation marks omitted). Concluding that "certain States ha[d] denied to persons within their jurisdiction the equal protection of the laws," Congress enacted § 1983 with "three main aims[:]" first to "override certain kinds of state laws"; second to "provide[] a [federal] remedy where state law was inadequate"; and third "to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice." *Id.* at 173–75.

In the century and a half § 1983 has been on the books, private plaintiffs have relied on the statute to vindicate a host of federal rights. Section 1983 has provided the cause of action in major cases addressing the right to free speech under the First Amendment;[7] the right to be free from unnecessarily cruel methods of execution under the Eighth Amendment;[8] the right to marriage under the Fourteenth Amendment;[9] the right to bear arms under

---

[7] *See* Compl. at 4, *303 Creative LLC v. Elenis*, 405 F. Supp. 3d 907 (D. Colo. 2019) (No. 16-cv-2372), *aff'd*, 6 F.4th 1160 (10th Cir. 2021), *rev'd*, 143 S. Ct. 2298 (2023).

[8] *See Nance v. Ward*, 142 S. Ct. 2214, 2219 (2022).

[9] *See* Compl. at 7, *Obergefell v. Wymyslo*, 962 F. Supp. 2d 986 (S.D. Ohio 2013) (No. 1:13-cv-501), *rev'd sub nom. DeBoer v. Snyder*, 772 F.3d 388 (6th Cir. 2014), *rev'd sub nom. Obergefell v. Hodges*, 576 U.S. 644 (2015).

the Second Amendment;[10] and the Fourteenth Amendment's prohibitions on segregation and legislative malapportionment.[11] As these examples demonstrate, civil suits under § 1983 can further important federal interests. *See also Hubbard*, 803 F.3d at 1312 ("Don't misunderstand us. We are not saying that enforcing the First Amendment is not an important federal interest or that it does not protect important constitutional values. Obviously it is and does."). And sometimes discovery seeking to inquire "into the motivation for [legislative] acts" is part and parcel of that furtherance. *Id*. at 1310 (emphasis removed) (internal quotation marks omitted).

This case helps show why. In Count IV, the plaintiffs alleged that the Act violates the Equal Protection Clause of the Fourteenth Amendment because the Act "was enacted for a racially discriminatory purpose" and would cause racially disparate harm. Doc. 76 at 95. To state the obvious: equal protection claims brought against the states under § 1983 alleging racial discrimination unquestionably may implicate important federal interests. After all, "the central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States." *McLaughlin v. Florida*, 379 U.S. 184, 192 (1964). Said differently, the thrust of the amendment was to override comity in the service of a federal interest of enormous gravity: racial equality. And the

---

[10] *See Parker v. Dist. of Columbia*, 478 F.3d 370, 374 (D.C. Cir. 2007), *aff'd sub nom. Dist. of Columbia v. Heller*, 554 U.S. 570 (2008).

[11] *See Reynold v. Sims*, 377 U.S. 533, 537 (1964) (legislative malapportionment); *Turner v. City of Memphis*, 369 U.S. 350, 351 (1962) (racial segregation).

amendment itself anticipates that Congress will exercise authority to enforce its provisions through legislation—like 42 U.S.C. § 1983. *See* U.S. Const. amend. XIV, § 5.

These claims also frequently require courts to determine the motivations for legislative behavior. When a legislative enactment facially discriminates based on race, there is little need to probe the legislature's subjective motivations. We simply apply strict scrutiny. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 235–36 (1995). But the same is not true when a law is facially race neutral but may have a disparate impact on a racial group. Under those circumstances, a plaintiff must demonstrate "discriminatory racial purpose" underlying the challenged law. *Washington v. Davis*, 426 U.S. 229, 241 (1976). This means that the plaintiff must "show that the State's decision or act had a discriminatory purpose and effect;" otherwise, "their constitutional claims fail." *Greater Birmingham*, 992 F.3d at 1321 (internal quotation marks omitted). Put another way, the legislature's subjective motivation *is* the case.

Although as a general matter it is "not consonant with our scheme of government for a court to inquire into the motives of legislators," *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951), such an inquiry is exactly what a disparate impact claim requires. As the Supreme Court has explained, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977). In making such a determination,

"[t]he legislative or administrative history"—including "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports"—"may be highly relevant." *Id.*

That is why we frequently consider detailed evidence about what individual legislators said, did, or knew in the context of equal protection suits under § 1983. *See, e.g., League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 931–32, 938–40 (11th Cir. 2023); *Greater Birmingham*, 992 F.3d at 1322–26; *City of Carrollton Branch of the N.A.A.C.P. v. Stallings*, 829 F.2d 1547, 1551–53 (11th Cir. 1987); *Underwood v. Hunter*, 730 F.2d 614, 618–20 (11th Cir. 1984), *aff'd*, 471 U.S. 222 (1985). So do the district courts within our circuit. *See, e.g., GRACE, Inc. v. City of Miami*, No. 1:22-cv-24066, --- F.Supp.3d ----, 2023 WL 3594310 at *5–6 (S.D. Fla. May 23, 2023); *Jacksonville Branch of NAACP v. City of Jacksonville*, No. 3:22-cv-493, 635 F. Supp. 3d 1229, 1291–95 (M.D. Fla. 2022); *City of S. Miami v. DeSantis*, 561 F. Supp. 3d 1211, 1271–80 (S.D. Fla. 2021), *vacated on jurisdictional grounds*, 65 F.4th 631 (11th Cir. 2023). And, for that matter, so does the Supreme Court. *See Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *see also Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 489 (1997) (noting, in applying *Arlington Heights* to preclearance action under Voting Rights Act, "considerations relevant to the purpose inquiry include . . . the legislative or administrative history, *especially* any contemporary statements by members of the decisionmaking body" (emphasis added) (alterations adopted) (internal quotation marks omitted)).

The majority opinion's holding, which cuts off one source of evidence of legislative intent (third-party discovery) in a whole class of cases (those brought under 42 U.S.C. § 1983), amplifies a worrying trend in this Court's equal-protection jurisprudence. In recent years, this Court has discounted certain forms of evidence under the *Arlington Heights* inquiry—history, in particular. This Court's decision in *Greater Birmingham* took the view that a "historical background analysis" under *Arlington Heights* focuses "on the specific sequence of events leading up to the challenged decision and [does] not provid[e] an unlimited look-back to past discrimination." *Greater Birmingham*, 992 F.3d at 1325 (internal quotation marks omitted). More recently—and over my dissent—this Court has admonished the district courts in our circuit that "the proper scope of a historical inquiry" under *Arlington Heights* does not include "a state's history of discrimination and socioeconomic disparities." *League of Women Voters*, 66 F.4th at 923. Instead, courts must "look at the precise circumstances surrounding the passing of the law in question." *Id.* (internal quotation marks omitted). More broadly, we have remarked that "determining the intent of the legislature is a problematic and near-impossible challenge." *Greater Birmingham*, 992 F.3d at 1324. So much so that equal protection plaintiffs who lack "smoking gun evidence," *id.* at 1325 (internal quotation marks omitted), of an intent to discriminate frequently lose in our Court—even when they have prevailed in the district courts, *see League of Women Voters*, 66 F.4th at 918–19.

Today, the majority opinion places equal protection plaintiffs within our circuit in a double bind. Under our existing precedent, they must meet the increasingly difficult task of producing persuasive evidence of legislative intent to discriminate. And they must do so by focusing on the specific chain of events leading to the enactment of the challenged legislation. The majority opinion adds that—no matter the circumstances—they are not entitled to discovery into "legislative acts or the motivation for actual performance of legislative acts." Maj. Op. at 7 (internal quotation marks omitted). In essence, the majority opinion forces a whole category of plaintiffs, tasked with an already difficult standard of proof, to make their cases without the tools ordinarily available to civil litigants.[12]

-----

[12] I do not mean to suggest that equal protection plaintiffs will be totally unable to obtain materials to support their cases. When circumstances allow, they may be able to subpoena third parties sufficiently removed from the legislative process to fall outside the scope of the privilege. *See Page v. Va. State Bd. of Election*, 15 F. Supp. 3d 657, 662–64 (E.D. Va. 2014) (collecting examples). Likewise, state law or legislative practice may also effectively guarantee access to some relevant documentary materials. *See* Fla. Const. art. I, § 24. And, of course, legislators may waive or decline to invoke their privilege. *See* Fed. R. Civ. P. 45(d)(3)(A)(iii). But the district court took into account "the availability of other evidence" when it determined that the privilege should yield in this case. Doc. 100 at 10. The majority opinion's rule means that § 1983 plaintiffs are not entitled to documentary discovery against legislators ever—even when no other route is available to discover evidence to test their claims.

The district court charted a better course. It recognized that "some civil cases implicate federal interests that are at least as important—if not more important—than the enforcement of federal criminal statutes, where the privilege undoubtedly gives way." Doc. 100 at 9; *accord Gillock*, 445 U.S. at 373 ("[W]here important federal interests are at stake, as in the enforcement of federal criminal statutes, comity yields."). It then applied a balancing test and determined this was such a case.

Under Federal Rule of Evidence 501, that was appropriate. Rule 501 instructs us—"United States courts"—to interpret the scope of federal common-law privileges (and thus the privilege held by the legislators) "in the light of reason and experience." Fed. R. Evid. 501. Reason suggests that if comity yields to the federal interest in enforcing federal criminal statutes against state legislators, it can also yield to other federal interests of comparable importance. Judicial experience teaches that § 1983 cases can both involve important federal interests and require inquiry into legislative motivations.

In *Gillock*, faced with determining whether a federal interest it had identified justified overcoming the legislative privilege, the Supreme Court looked to its resolution of a similar dilemma in the context of the executive privilege. *Gillock*, 445 U.S. at 373 ("We recognize that denial of a privilege to a state legislator may have some minimal impact on the exercise of his legislative function; however, similar arguments made to support a claim of Executive privilege were found wanting in *United States v. Nixon* when balanced

against the need of enforcing federal criminal statutes." (internal citation omitted)). The district court did, too. It borrowed a balancing test applicable to the deliberative-process privilege—an executive privilege designed to protect the "process by which governmental decisions and policies are formulated" and thus "enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2021) (internal citation and quotation marks omitted). It also cited precedent recognizing the differences between these two privileges and carefully adapting the test to better suit the purposes of the legislative privilege. Doc. 100 at 9 (citing *Bethune-Hill v. Va. State Bd. of Elections*, 114 F. Supp. 3d 323, 338 (E.D. Va. 2015)). And, consistent with Rule 501's command to interpret privileges in light of judicial experience, the district court applied the same balancing test to evaluate claims of legislative privilege as have district courts in numerous other cases.[13]

In adopting an untested, *per se* rule, the majority opinion criticizes the district court's application of a balancing test as "manipulable"—as if balancing tests were not commonplace in our law.

---

[13] *See, e.g., S.C. State Conf. of NAACP v. McMaster*, 584 F.Supp.3d 152, 163 (D.S.C. 2022); *League of Women Voters of Fla., Inc. v. Lee*, 340 F.R.D. 446, 456 (N.D. Fla. 2021); *Church v. Montgomery Cnty.*, 335 F. Supp. 3d 758, 767 (D. Md. 2018); *Benisek v. Lamone*, 241 F. Supp. 3d 566, 575 (D. Md. 2017) (Niemeyer, J.); *Bethune-Hill*, 114 F. Supp. 3d at 338; *Favors v. Cuomo*, 285 F.R.D. 187, 217 (E.D.N.Y. 2012); *Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 100–01 (S.D.N.Y. 2003).

Maj. Op. at 11. A balancing test is appropriate here. Although *Gillock* did not adopt any particular test, the Supreme Court balanced the strength of the federal interest in the enforcement of criminal statutes against the comity interest protected by the privilege. *See Gillock*, 445 U.S. at 373 ("[R]ecognition of an evidentiary privilege for state legislators for their legislative acts would impair the legitimate interest of the Federal Government in enforcing its criminal statutes with only speculative benefit to the state legislative process.").

The breadth of our construction of the legislative privilege in *Hubbard* (namely, that whenever the relevant purpose of a document request is to discover "the subjective motivations of those acting in a legislative capacity," the privilege applies) weighs against a *per se* rule, too. *Hubbard*, 803 F.3d at 1311. As we have interpreted it, the legislative privilege reaches intrusions into the legislative process both petty and great. But the majority opinion draws no distinction between them. The majority opinion would treat alike the legislature's interest in avoiding a subpoena seeking the production of the purely factual record before it when it made a legislative decision and one seeking to depose sitting legislators to interrogate their motivations in undertaking their legislative duties. Of course, each discovery request infringes on at least some of the interests underlying the legislative privilege and thus properly triggers a privilege analysis. *Id.* But the majority opinion flattens the analysis that follows into a single rule: the legislators win. The majority opinion does so even though sometimes the legislative interest in avoiding discovery will be minute (and thus appropriately

overcome) and other times it will be great (and thus appropriately undisturbed). Respectfully, that defies both "reason and experience." Fed. R. Evid. 501.

By contrast, the factors the district court considered are sensible ones. They seek to approximate and weigh both the degree to which the discovery would advance an important federal interest and the degree to which it would offend comity. They are also likely to vary significantly from case to case (yet another reason to avoid a one-size-fits-all approach to claims of legislative privilege). For instance, the district court considered "the availability of other evidence"—acknowledging that where a § 1983 plaintiff can turn to other sources to explore legislative motive, breaching the privilege is inappropriate. Doc. 100 at 10. It considered the relevance of the evidence likely to be obtained by breaching the privilege. That inquiry was appropriate because although sometimes "the subjective motivations of" a bill's "leading sponsors are highly relevant," *id.*, in other instances they are not relevant at all, *see, e.g.*, *Hubbard*, 803 F.3d at 1312 ("[W]hen a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose."). The district court also considered the seriousness of the litigation, concluding that because the plaintiffs "are seeking to vindicate public right[s] that impact thousands of faculty and students," Doc. 100 at 11, their claim involved federal interests similar in importance to those "at stake . . . in the enforcement of federal criminal statutes," *Gillock*, 445 U.S. at 373. Finally, the district court

considered "the legislative privilege's purpose." Doc. 100 at 12. Because it considered this factor, the district court was able to distinguish between "the most egregious intrusions into the legislative process," *id.* at 13, such as requests for the communications of individual legislators and their staff, and those that would do much less to offend principles of comity, such as requests for factual information available to the legislators. The majority opinion flatly prohibits district courts from considering any of this.

To be clear, I do not suggest swapping the majority opinion's *per se* rule for another. My view is much more modest: In rare instances, the interest in enforcing federal law and the Constitution will justify allowing § 1983 plaintiffs to seek at least some discovery from state legislators. And a balancing test is a perfectly sensible way to identify these instances. This approach does not mean that whenever legislative intent is an element of a plaintiff's claim, the privilege will yield. Not at all. Even when legislative intent is highly relevant, careful balancing may compel the conclusion that the privilege holds—such as when the form of discovery the plaintiff seeks is particularly intrusive or the plaintiff has other ways to obtain similar information.

The majority opinion portrays its absolutist approach as the logical result of precedent. But this is not so. Despite its startling reach, the majority opinion's holding lacks substantial support. Of the decisions it cites, almost none actually endorses a holding that

the legislative privilege never yields in § 1983 cases.[14] And no precedent binding on us requires this outcome. The majority opinion's holding is an outlier.

Since *Gillock*, "the Supreme Court has not set forth the circumstances under which the privilege must yield" to other federal interests. *Lee v. City of L.A.*, 908 F.3d 1175, 1187 (9th Cir. 2018). And neither have we. The closest brush this Court has had with the question came in *Hubbard*. *Hubbard* involved a First Amendment retaliation claim against Alabama officials under 42 U.S.C. § 1983. *Hubbard*, 803 F.3d at 1301. Although we acknowledged that as a general matter "enforcing the First Amendment" constitutes "an important federal interest," we found that the underlying lawsuit in *Hubbard* lacked merit. *Id*. at 1312. So, in that particular case, "the specific claim asserted [did] not legitimately further an important federal interest" and the privilege did not yield. *Id*. We reserved the question of "whether, and to what extent, the legislative privilege would apply to a subpoena in a private civil action based on a different kind of constitutional claim"—such as a legally sufficient

_____

[14] The sole exception is the Fifth Circuit's recent decision in *La Union Del Pueblo Entero*, 68 F.4th at 237–40. That decision is unpersuasive. Like the majority opinion here, the Fifth Circuit rested its decision on the flawed premise that because state legislators hold immunity from liability in § 1983 actions under *Tenney*, they must also hold an absolute privilege against third party discovery in § 1983 actions against other state officials. *See id*. at 239–40 ("[A] state legislator's common-law absolute immunity from civil actions precludes the compelled discovery of documents pertaining to the state legislative process[.]"). But, as I address in my discussion of the majority opinion's (mis)use of *Tenney* below, there is simply no reason why that must be so.

one. *Id*. at 1312 n.13. That is why the legislators concede that this Court has "had no occasion to address whether the evidentiary privilege . . . is absolute" in our prior cases. Br. of Appellants at 13.

The majority opinion's attempts to look beyond *Gillock* and *Hubbard* for support are unpersuasive. The cases it cites do not support a holding that legislative privilege never yields in § 1983 cases.

Take one example. The majority opinion puts significant stock in the Supreme Court's decision in *Tenney v. Brandhove* and later statements in *Gillock* and *Hubbard* repeating *Tenney's* holding. *See Gillock*, 445 U.S. at 372; *Hubbard*, 803 F.3d at 1312. The majority opinion reasons as if *Tenney* (and its treatment by *Gillock*) resolves this case. *See* Maj. Op. at 11 ("In the light of *Gillock* and *Tenney*, we cannot except civil-rights actions from the application of the legislative privilege."). But as the Supreme Court explained in *Gillock*, "the issue [in *Tenney*] was whether state legislators were immune from civil suits for alleged violations of civil rights under 42 U.S.C. § 1983," not whether they could be required to turn over evidence as third parties. *Gillock*, 445 U.S. at 371. *Tenney* was an action in which a plaintiff sued an individual legislator, seeking money damages under § 1983 for allegedly unconstitutional legislative activity. *Tenney*, 341 U.S. at 371.

In concluding that the legislator was immune from such an action, the *Tenney* court *warned against* confusing its holding on immunity from suit with one addressing the scope of third-party evidentiary privileges: "We have only considered the scope of the privilege as applied to the facts of the present case." *Id*. at 378. And

it cautioned that "privilege in such a case deserves greater respect than where . . . the legislature seeks the affirmative aid of the courts to assert a privilege." *Id*. Under the rubric of comity, drawing such a distinction makes good sense. Compared to affirmatively subjecting individual state legislators to liability for discharging legislative functions, "[t]he absence of a judicially created evidentiary privilege for state legislators is not . . . comparable intervention by the Federal Government into essential state functions." *Gillock*, 445 U.S. at 371.

Consider a second example of the majority opinion's slippery use of precedent. The majority opinion cites language from the D.C. Circuit's decision in *Brown & Williamson Tobacco Corp. v. Williams* stating that "[w]e do not perceive a difference in the vigor with which the privilege protects against compelling a congressman's testimony as opposed to the protection it provides against suit." 62 F.3d 408, 421 (D.C. Cir. 1995). But the privilege at issue in *Williams* was not the federal common-law privilege against discovery held by state legislators under Federal Rule of Evidence 501, it was the constitutional privilege contained in the Speech or Debate Clause of Article I. U.S. Const., art. I, § 6, cl. 1. I have already explained the foundational differences between that privilege and this one. So has the Supreme Court. *See Gillock*, 445 U.S. at 366–71.

And here is a third example. The majority opinion claims that four of our sister circuits—the first, the fifth, the eighth, and the ninth—"have rejected [the] approach" taken by the district court. Maj. Op. at 11 (citing *Am. Trucking Ass'ns v. Alviti*, 14 F.4th

76, 88 (1st Cir. 2021); *La Union Del Pueblo Entero*, 68 F.4th at 239–40; *In re N.D. Legis. Assembly*, 70 F.4th 460, 465 (8th Cir. 2023); *Lee*, 908 F.3d at 1186). But only one of these courts (the Fifth Circuit) has actually held that the legislative privilege is "insurmountable" in section 1983 claims. *Id.* at 10. In *Lee*, the Ninth Circuit held that "the factual record . . . [fell] short of justifying the substantial intrusion into the legislative process" of deposing legislators. *Lee*, 908 F.3d at 1188 (internal quotation marks omitted). But it did not shut the door on all discovery in the way the majority opinion does today. *See id.* (acknowledging that "extraordinary circumstances . . . might justify an exception to the privilege" (internal quotation marks omitted)). The same goes for the First Circuit in *Alviti*. *Alviti* confirmed that "the mere assertion of a federal claim" was not "sufficient" to breach the privilege (a proposition with which the district court here agreed). *Alviti*, 14 F.4th at 88. But the First Circuit preserved the possibility that "there might be a private civil case in which state legislative immunity must be set to one side because the case turns so heavily on subjective motive or purpose." *Id.* It reasoned that the claim at issue, which arose under the Dormant Commerce Clause, did not depend on "proof of the subjective intent of state lawmakers," and so the need for discovery could not "warrant setting aside the privilege." *Id.* at 88–89. And so too for the eighth, which acknowledged that the underlying case before it did "not even turn on legislative intent" and so could not qualify as an "'extraordinary instance[]' in which testimony might be compelled from a legislator." *In re N.D. Legis. Assembly*, 70 F.4th at 464–65 (quoting *Arlington Heights*, 429 U.S. at 268). Citing *Alviti*, the

Eight Circuit also observed that "[a]ny exception to legislative privilege that might be available in a case that is based on a legislature's alleged intent is thus inapplicable." *Id*. at 465.[15] It did not shut the door entirely.

At the end of the day, only the majority opinion is responsible for this worrisome development in our precedent. I fear its holding will hamper efforts to enforce constitutional limits on state behavior and thus impair important federal interests. *Gillock* gives us the authority to avoid exactly this outcome: "where important federal interests are at stake[,] . . . comity yields." *Gillock*, 445 U.S. at 373.

★ ★ ★

A conclusion that the district court properly qualified the privilege invoked by the legislators ends this appeal. The legislators staked their appeal on the argument that the privilege never yields in cases arising under § 1983; they declined to challenge the district court's order on any other grounds. The majority rewards this risky strategy and delivers the legislators a grand slam. I would hold that the legislative privilege is not absolute in § 1983 cases—and

---

[15] To be sure, the Eight Circuit wrote disapprovingly of the balancing test employed by the district court here. But it did not hold, as the majority opinion does, that legislative privilege is never overcome in suits arising under § 1983.

nothing more. Because I would thus affirm the district court's order denying in part the legislators' motion to quash, I respectfully dissent.